GORDON CHEMICAL CO., INC. & others *vs.* THE AETNA CASUALTY AND SURETY COMPANY & others.

Worcester. December 9, 1970. — February 2, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, REARDON, & QUIRICO, JJ.

*Insurance,* Against business interruption loss. *Corporation,* Corporate entity. *Words,* "Resumption of operations."

Under a policy insuring a manufacturer of polystyrene against loss of profits through interruption of its business caused by damage to its property, and providing that if the insured could reduce the loss "by complete or partial resumption of operation of the property herein described, whether damaged or not, or . . . by making use of other property at the location(s) described herein or elsewhere, or . . . by making use of stock (raw, in process or finished) at the location(s) described herein or elsewhere, such reduction . . . [should] be taken into account in arriving at the amount of loss," where it appeared in an action on the policy that the insured had sold its entire product to another manufacturer which processed the polystyrene into plastic molding pellets for sale by it, and that the insured sustained damage to its property by fire and was unable to manufacture polystyrene at its plant for many months, it was held that the insured was not obligated during such period to purchase polystyrene on the open market and resell it to the second manufacturer, although such a course would have prevented any loss on the part of the insured. [635, 637]

In an action on a policy insuring three corporations, "as their interests may appear," against loss of profits through interruption of business caused by damage to property, where it appeared that certain land and buildings were owned by one corporation, that the other two corporations carried on separate manufacturing activities in separate

plants located on such premises, that one of the manufacturing corporations sold its entire product, polystyrene, to the other manufacturing corporation, which processed it and then sold its own product, plastic molding pellets, that the corporations had a common management, that for a substantial period the first manufacturing corporation lost net profits as a direct result of an interruption of its business caused by damage to its property by fire, and that during that period the second manufacturing corporation purchased polystyrene from outside sources and its profits increased, it was held that there was no merit in a contention by the insurer that the three corporations should be treated as a single corporation and that on that basis no loss was sustained, where it also appeared that the stockholders of the three corporations were not identical, that the employees of the manufacturing corporations were different persons, that separate books of account for each corporation were kept by different individuals, and it did not appear that the increased profits of the second manufacturing corporation were due to the fire. [637–639]

CONTRACT. Writ in the Superior Court dated January 5, 1966.

The action was heard by *Meagher, J.*

*Francis E. Dooley, Jr.,* for Factory Insurance Association.

*Francis P. O'Connor* for Gordon Chemical Co., Inc.

SPALDING, J. This is an action of contract to recover for business interruption loss on an insurance policy. It was submitted on a case stated and there was a finding, in the amount of $211,350, for the plaintiff Gordon Chemical Co., Inc. (hereinafter sometimes called the plaintiff) which we treat as an order for judgment.[1] *Shrewsbury* v. *Murphy,* 333 Mass. 290, 291. The defendant [2] appealed. G. L. c. 231, § 96.

At all times here material there were in existence between Hammond Plastics, Inc., Gordon Chemical Co., Inc., Gordon Realty Corporation, and the Factory Insurance Association two policies of insurance, as amended by certain endorsements. One of these policies insured real and personal property against the risk of fire and explosion. The

---

[1] There were three plaintiffs, Hammond Plastics, Inc., Gordon Realty Corporation, and Gordon Chemical Co., Inc.

[2] The defendants are a group of stock companies engaged in the insurance business doing business under the name Factory Insurance Association. It is agreed that for the purpose of this case the defendants be treated as one defendant under the name of Factory Insurance Association.

plaintiff makes no claim under this policy, full payment thereunder having been made. The other policy insured against business interruption loss. This policy describes the insured as "Hammond Plastics, Inc. and Gordon Realty Corporation of Worcester and Gordon Chemical Company and Oxgord [*sic*] Polymers Inc. as their interests may appear." The policy covers, for such length of time as would be required, by the exercise of due diligence and dispatch to rebuild and replace the damaged property, the actual loss sustained on the net profits which are prevented from being earned and on the necessarily continuing charges and expenses. The policy also covered payroll expense, which was incurred and would have been earned had no loss occurred, for a period not in excess of ninety days.

On July 20, 1963, real estate which was owned by Gordon Realty Corporation (Gordon Realty), machinery which was owned by Gordon Chemical Co., Inc. (Gordon), and plastic stock which was owned by Hammond Plastics, Inc. (Hammond), all of which were located at 80–92 Webster Street, Worcester, were damaged by fire and explosion. As a direct result thereof, Gordon for fifteen months (from July 20, 1963, through October 20, 1964) was unable to manufacture its product at the Worcester plant. This fifteen month period was required to rebuild, repair and replace the damaged property.

Gordon and Hammond carried on their businesses in separate plants both of which were located on the same parcel of land. The land and buildings were owned by Gordon Realty. At the time of the fire Gordon's business was the conversion of monomer liquid plastic, which it purchased elsewhere, into polystyrene. It produced crystal polystyrene at its plant in Worcester and it produced high impact polystyrene at its Oxford plant. Gordon sold its entire product to Hammond "for the purpose of being colored, extruded and manufactured into plastic molding pellets for sale by Hammond." As a direct result of the interruption of its business Gordon lost net profits and incurred charges and expenses amounting in the aggregate to $211,350.

Management functions of Gordon and Hammond were performed by the same persons. After the fire and explosion they purchased polystyrene on behalf of Hammond from outside sources. If they had chosen to purchase such polystyrene on behalf of Gordon instead of on behalf of Hammond, they could have done so and could have then resold the polystyrene on behalf of Gordon to Hammond. Had this course been pursued, Gordon would have sustained no loss.

During the fifteen month period that Gordon could not operate its plant, Hammond sold its products to virtually the same customers and at the same prices as before the fire. However, its net profit during this period was $239,675 more than that realized during a similar period prior to the fire.

1. The defendant contends that Gordon was obligated under the insurance policy to purchase polystyrene on the open market and resell it to Hammond. It is agreed that no loss would have resulted if Gordon had done this. It is also agreed that the loss suffered by Gordon is covered by the business interruption policy unless the purchase by Gordon of polystyrene from others is one of the activities contemplated by paragraph 5 of the policy.

Paragraph 5 provides: "It is a condition of this insurance that if the Insured could reduce the loss resulting from the interruption of business, A. by complete or partial resumption of operation of the property herein described, whether damaged or not, or B. by making use of other property at the location(s) described herein or elsewhere, or C. by making use of stock (raw, in process or finished) at the location(s) described herein or elsewhere, such reduction shall be taken into account in arriving at the amount of loss hereunder." Paragraph 5 is entitled "RESUMPTION OF OPERATIONS." To resume is, of course, to recommence something which has been interrupted. As used in the policy these words mean to recommence the use of the insured property, or to recommence the business of the insured by using the property described in the policy or by using other property in the

same way as the described property was used before the fire. The purchase and resale by Gordon of polystyrene from its competitors is not in any sense a resumption of its operation. Gordon was a manufacturer of polystyrene from monomer liquid plastic. The purchase and resale of polystyrene is not a recommencement of manufacturing nor is it a recommencement of the use of its property.

In support of the argument that Gordon was required by the policy to purchase and resell polystyrene, the defendant quotes from *National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp.* 141 F. 2d 443, 445 (10th Cir.), the following: "the policy [of insurance (Business Interruption)] is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred — no more." No more certainly, but also no less. Gordon was required to continue or to resume manufacture of polystyrene from monomer liquid plastic when and if possible and to sell the product manufactured by it as it would have done if no fire had occurred. However, it was not required to buy from competing manufacturers and resell their product, which it would never have done had no fire occurred. The purpose of the policy is to preserve the continuity of the insured's earnings. The policy does not accomplish that purpose if the insured manufacturer is required to act as a distributor for its competitors in order to reduce its business interruption loss. A careful reading of the individual clauses of paragraph 5 reinforces our belief in this conclusion.

Clause 5, subpar. A, speaks of reduction of loss "by complete or partial resumption of operation of the property herein described, whether damaged or not . . . ." The "property herein described" is the real and personal property on the described premises. This, obviously, does not include polystyrene which is manufactured or sold by other than the insured.

Clause 5, subpar. B, speaks of reduction of loss "by making use of other property at the location(s) described herein

or elsewhere . . . ." "Other property" must refer to machinery or real estate which is not described in the policy, and not to finished stock which is manufactured either by the insured or by a competitor, since if it referred to stock, clause 5, subpar. C, would be surplusage.

Clause 5, subpar. C, of the policy speaks of reduction of loss "by making use of stock (raw, in process or finished) at the location(s) described herein or elsewhere." "Raw stock," "stock in process" and "finished stock" are defined in paragraph 11. "Raw stock" is materials "in the state in which the Insured receives them for conversion by the Insured into finished stock . . . at the location(s) herein described." In the case at bar this would be monomer liquid plastic, not polystyrene. "Stock in process" is raw stock which has been partially processed "at the location(s) herein described." This also is monomer liquid plastic which the insured has processed and not polystyrene which has been purchased elsewhere. "Finished stock" is stock "manufactured by the insured . . . ." Polystyrene which is purchased from competitors is not anything manufactured by Gordon. Thus, clause 5, subpar. C, provides that if the insured is able to partially resume its normal operations by making use of raw or partially finished materials in its customary fashion, it must do so.

We conclude that the purchase and resale of polystyrene manufactured by others is not contemplated by any of these clauses. Nor is there anything in *Northwestern States Portland Cement Co.* v. *Hartford Fire Ins. Co.* 360 F. 2d 531 (8th Cir.), relied on by the defendant, at variance with this conclusion. In that case, which involved the construction of a clause equivalent to clause 5, subpar. C, the insured had on hand finished stock, which it had manufactured, and it lost neither sales nor earnings.

2. The defendant further argues that the three corporations in question should be treated as one single corporation for the purposes of the insurance policy. If this is done, no loss was sustained. The defendant argues that since Hammond, Gordon, and Gordon Realty are owned and controlled

by. the same persons, operating branches of one business, each of which was interdependent with the other, and insured for one amount under one policy with the defendant, they are one single insured and that their interests appear and are in fact the same. The short answer is while their interests may appear to be, they are not in fact the same. The stockholders of the several corporations were not identical. One of them, Fannie Gordon, for example, owned stock in Hammond only. Others, the Rudermans, owned stock in Gordon only. No stockholder owned the same proportion of outstanding stock in any two of these corporations.

Although the corporations had common management, the employees of Gordon otherwise were different persons from the employees of Hammond. Separate books of account for each company were kept by different individuals. Gordon lost net profits after the fire. Hammond had an increase in profits after the fire.

"Ownership of all the stock in several corporations by one person does not create a single unit or justify a disregard of separate corporations. . . . Different corporations usually are distinct entities in law. It is only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy, that it can be disregarded." *New England Theatres, Inc.* v. *Olympia Theatres, Inc.* 287 Mass. 485, 493. "The ownership of all the stock and the absolute control of the affairs of a corporation do not make that corporation and the individual owner identical, in the absence of a fraudulent purpose in the organization of the corporation." *M. McDonough Corp.* v. *Connolly,* 313 Mass. 62, 66. *Galdi* v. *Caribbean Sugar Co.* 327 Mass. 402, 407–408. *My Bread Baking Co.* v. *Cumberland Farms, Inc.* 353 Mass. 614. There is no justification here for disregarding the separate existence of each of the corporations named in the policy. They were as a matter of law separate and distinct legal entities when the policy was entered into, when the fire occurred and thereafter. Further, we are of opinion that the language used in the policy did not disclose any inten-

tion by the parties to treat the several corporations as a single entity for insurance purposes.

The defendant indicates concern that if Gordon is permitted to recover its lost profits in this case, then Gordon and Hammond together will have realized more profit than if there had been no fire. The record, however, does not warrant the conclusion that the increased profits of Hammond were due to the fire. Such a conclusion is, therefore, purely speculative.

*Order for judgment affirmed.*