**STEEL PRODUCTS COMPANY, INC.,**
Appellee,

v.

**MILLERS NATIONAL INSURANCE COMPANY et al., Appellants.**

**No. 55668.**

Supreme Court of Iowa.

July 3, 1973.

Rehearing Denied Sept. 13, 1973.

Simmons, Perrine, Albright & Ellwood, Robert C. Tilden, Cedar Rapids, and Clausen, Hirsh, Miller & Gorman, James T. Ferrini, Chicago, Ill., for appellants.

Lynch, Dallas, Smith & Harmon, C. J. Lynch, Cedar Rapids, for appellee.

Heard before MOORE, C. J., and RAWLINGS, LeGRAND, UHLENHOPP and McCORMICK, JJ.

McCORMICK, Justice.

In this case we must decide how to determine the period of business interruption under policies providing business interruption insurance. Plaintiff Steel Products, Inc. suffered the business interruption because of damage to its premises by fire. Defendant insurers contend the period of business interruption did not end until the premises were rebuilt. Plaintiff asserts the period ended earlier when it resumed full production. Trial was to the court on stipulated facts. Trial court ascribed to the policies the meaning urged by plaintiff and entered judgment accordingly. We reverse and remand with instructions.

Plaintiff was lessee of the factory building involved, engaged in the manufacture of vending machines for hot chocolate and other products. The sole customer for its machines was Food Producers, Inc., which traditionally placed its orders in January and February for a one-year period commencing the following April 1st. Thus, January, February and March 1970 were to

be occupied completing the 1969 order, and starting April 1, 1970, plaintiff would be working to fill the 1970 order. However, on February 6, 1970, a portion of the building was destroyed by fire.

A fire wall separated the building into two sections. All of one section except a basement paint area was destroyed. The rest of that basement had been used for assembly, finishing and storage of machines. Two floors above were used for offices and storage. The manufacturing was mostly done in the section which did not burn.

The parties agreed that as a result of the fire plaintiff's payroll was reduced $1288 by April 1, 1970. In addition, during the same period plaintiff used shop labor valued at $8544 in salvage and cleanup work for which it was reimbursed by its property insurers.

Plaintiff's operations remained shut down from February 6, 1970, until the latter part of March. By moving its assembly and other operations except painting into the unburned section of the building, repairing the paint room and clearing debris to make room for storage in the burned portion, and renting outside office and warehouse space, plaintiff was then able to resume partial operations and on April 1, 1970, resumed the same rate of production as before the fire.

Substantial restoration of the burned area was accomplished by August 1, 1970, although finishing work took until November 1970. On August 1, 1970, plaintiff resumed use of the restored area. Its extra expenses through July to resume production were stipulated as $3,198.56. No question is raised as to plaintiff's due diligence in rebuilding the burned area.

By May 19, 1970, plaintiff had completed the orders scheduled for production in February and March and after that date was working on orders for the year starting April 1st. In June 1970 plaintiff was advised by its customer it would not need all the machines ordered for that year.

Other types of machines, not originally scheduled, were subsequently ordered, but plaintiff does not know what effect these events would have had on its production if no fire had occurred.

For the year 1969 plaintiff had a gross profit of $86,638.39 on sales of $813,000 and for 1970 a gross profit of $35,651.72 on sales of $840,000.

The terms of business interruption coverage were defined in each policy by "Uniform Standard Business Interruption Form No. 4." We are concerned here with paragraphs 1 through 5 which are as follows:

1. This policy covers against loss resulting directly from necessary interruption of business caused by damage to or destruction of real or personal property, except finished stock, by the peril(s) insured against, during the term of this policy, on premises occupied by the Insured and situated as herein described.

2. In the event of such damage or destruction this Company shall be liable for the ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business, but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

3. Resumption of Operations: It is a condition of this insurance that if the

Insured could reduce the loss resulting from the interruption of business,

(a) by complete or partial resumption of operation of the property herein described, whether damaged or not, or

(b) by making use of other property at the location(s) described herein or elsewhere, or

(c) by making use of stock (raw, in process or finished) at the location(s) described herein or elsewhere, such reduction shall be taken into account in arriving at the amount of loss hereunder.

4. Expenses Related to Reducing Loss: This policy also covers such expenses as are necessarily incurred for the purpose of reducing loss under this policy (except expense incurred to extinguish a fire) and such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the Insured to reduce loss under this policy; but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced. Such expenses shall not be subject to the application of the Contribution Clause.

5. Gross Earnings: For the purposes of this insurance "Gross Earnings" are defined as the sum of:

(a) Total net sales value of production,

(b) Total net sales of merchandise, and

(c) Other earnings derived from operation of the business, less the cost of:

(d) Raw Stock from which such production is derived,

(e) Supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock or in supplying the service(s) sold by the Insured,

(f) Merchandise sold, including packaging materials therefor, and

(g) Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract. No other costs shall be deducted in determining Gross Earnings.

In determining Gross Earnings due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

The parties stipulated plaintiff's actual loss exceeded the reduction in gross earnings limitation in paragraph 2 so that the recoverable loss would be determined in part by calculation of the reduction in gross earnings for the period of business interruption.

They agreed the fire caused a reduction in gross earnings (as defined in paragraph 5) from February 6, 1970, to April 1, 1970, the date full production was resumed, of $45,099. They also agreed the reduction in gross earnings from February 6, 1970, to August 1, 1970, the date repairs were substantially completed, was $24,557.76.

They stipulated that if the court determined the period of business interruption ended April 1, 1970, as contended by plaintiff, plaintiff's recovery would be $45,099 (reduction in gross earnings) less abated expenses of $1288 (payroll reduction) and $8544 (labor reimbursement), reduced by contribution percentages set out in the policies, plus $3189.56, the amount expended by plaintiff to reduce its loss. The recovery would be charged against defendants in agreed proportions.

They alternatively agreed that if the court determined the period of business interruption ended August 1, 1970, as asserted by defendants, plaintiff's recovery would be $24,557.76 (reduction in gross earnings for the longer period) with the same adjustments as for the shorter period but with the amounts of $1288 and $8544

deducted from the reduced gross earnings figure only if the court determined such amounts were abated expenses applicable to the longer period.

Trial court held the period of business interruption ended April 1, 1970, and entered judgment against defendants calculated as agreed. The court also expressed the view that if the period had ended August 1, 1970, as alleged by defendants, the reduction in gross earnings could not be diminished by any abated expenses under the stipulated facts.

Two principal questions are presented by defendants' appeal. When did the period of business interruption end? If it did not end until August 1, 1970, are defendants entitled to credit against plaintiff's reduction in gross earnings for abated expenses to April 1, 1970?

I. *The period of business interruption.* Defendants contend the period of business interruption is the period required to rebuild, repair or replace the property which burned, here February 6, 1970, to August 1, 1970. Plaintiff asserts business interruption ends when full production is resumed, here April 1 1970, and is limited but not measured by the period of restoration. Resolution of this problem depends upon construction of the terms of the business interruption coverage.

█ Familiar principles are applicable. The intent of the contracting parties controls. This is determined by what the policy as a whole says. Rules relating to ambiguity are only resorted to if the policy is unclear. Kvalheim v. Farm Bureau Mutual Insurance Co., 195 N.W.2d 726, 729 (Iowa 1972); Stover v. State Farm Mutual Ins. Co., 189 N.W.2d 588, 591 (Iowa 1971). The policy language is interpreted from a reasonable rather than hypertechnical viewpoint. Qualls v. Farm Bureau Mutual Insurance Company, 184 N.W.2d 710, 712 (Iowa 1971).

█ The nature and purpose of business interruption insurance has been frequently noted:

"In numerous cases and text authorities it has been stated, and we think correctly, that the essential nature and purpose of business interruption insurance generally is to protect the earnings which the insured would have enjoyed had there been no interruption of the business." Northwestern States Portland 'Cem. Co. v. Hartford 'F. I. Co., 360 F.2d 531, 534 (8 Cir. 1966).

See also Gordon Chemical Co. v. Aetna Casualty & Surety Co., 358 Mass. 632, 266 N.E.2d 653, 656 (1971) ("The purpose of the policy is to preserve the continuity of the insured's earnings."); 4 Appleman, Insurance Law and Practice § 2329 at 324 (1969) ("Generally, the purpose of business interruption insurance is to protect the prospective earnings of the insured's business.").

In the ordinary situation it is not difficult to determine how this purpose is accomplished. An insured suffers a fire loss depriving him in whole or in part of the use and occupancy of the insured premises. The coverage is applicable under paragraph 1 of the standard form. The insurer is liable for the actual loss sustained from such business interruption under paragraph 2. The actual loss sustained is the actual earnings loss caused by the dispossession, measured by "profits that would have been earned if the business had not been interrupted and the expense of maintaining an organization during the period of interruption." Anchor Toy Corp. v. American Eagle Fire Ins. Co., 4 Misc.2d 364, 365, 155 N.Y.S.2d 600, 602 (1956).

However, the insured has a duty to mitigate his earnings loss by resuming operations during the period of interruption pursuant to paragraph 3. "As used in the policy these words mean to recommence the use of the insured property, or to recommence the business of the insured by using

the property described in the policy or by using other property in the same way as the described property was used before the fire." Gordon Chemical Co. v. Aetna Casualty and Surety Co., *supra*. When expenses are incurred in reducing the loss in this or other manner, the insured is entitled to reimbursement under paragraph 4. See Northwestern States Portland Cem. Co. v. Hartford F. I. Co., *supra*, 360 F.2d at 535.

Consequently, in the ordinary situation no ambiguity is suggested by the policy terms, although proof of "actual loss sustained," and "expenses incurred in reducing loss" may introduce evidentiary complexity.

The present case differs from the ordinary situation in two principal respects. One is the stipulation that instead of "actual loss sustained" the recovery is to include the reduction in gross earnings (defined in paragraph 5) less abated expenses "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such [insured property] as has been damaged or destroyed * * *." The second is the stipulation of all other facts upon which the parties want the case decided, which has the salutory effect of narrowing the controversy, but the collateral result of binding us to interpretation of the policies in view of a severely limited record. For example, we do not know the "actual loss sustained" nor do we have anything other than plaintiff's bare assertions in its brief as to what accounted for the gross earnings gain after April 1, 1970.

We are not aware of any court which has found the policy language involved here to be ambiguous. See, *e. g.*, Rogers v. American Insurance Co., 338 F.2d 240, 242 (8 Cir. 1964) ("We fully agree with the trial court that the policies are free of ambiguity."); annot. 83 A.L.R.2d 885, 896, et seq. In *Rogers* the insured sought to extend the period of reduced gross earnings beyond the period of restoration of the premises, and the court held the policy

language limited the reduced gross earnings recovery to the period of restoration.

Plaintiff seeks to distinguish *Rogers* and several other cases tying business interruption to the period of restoration. These cases fall into two categories, each of which we agree is factually distinguishable from the present case. One category, like *Rogers*, involves cases where an insured has sought to enlarge the period of computation of reduced gross earnings, and the courts have limited it to the period of restoration. See, *e. g.*, Pacific Coast Engineering Co. v. St. Paul Fire & Marine Ins. Co., 9 Cal.App.3d 270, 274, 88 Cal.Rptr. 122 (1970); Congress Bar & Restaurant, Inc. v. Transamerica Ins. Co., 42 Wis.2d 56, 165 N.W.2d 409 (1968). The second category involves cases where for one reason or another, an insured does not repair, replace or rebuild the insured premises. In these cases the courts have consistently held the reduced earnings computation is based on the theoretical period it would have taken to repair, replace or rebuild the premises with due diligence. See, *e. g.*, Beautytuft, Inc. v. Factory Insurance Association, 431 F.2d 1122 (6 Cir. 1970) (insured rebuilt at another site); Hawkinson Tread Tire Service Co. v. Indiana Lumbermans Mut. Ins. Co., 362 Mo. 823, 245 S.W.2d 24 (1951) (insured moved to a new site); Grand Pacific Hotel Co. v. Michigan Commercial Ins. Co., 243 Ill. 110, 90 N.E. 244 (1909) (insured prevented by lease forfeiture from rebuilding insured premises); Anchor Toy Corp. v. American Eagle Ins. Co., *supra* (insured made no effort to rebuild at site of destruction but first attempted to lease other premises and later rebuilt at another site).

In all cases in each category the insureds were seeking to enlarge the period of computation of reduced earnings and the insurers were seeking to shorten it. The present case differs in that here the insured is seeking to shorten the period and the insurer is seeking to extend it. The cases uniformly stand for the principle that the date by which the damaged premises

could have been restored with due diligence is a cut off date for computation of reduced gross earnings. The cases in the second category also stand for the rule that, where the damaged premises are not restored, the time for theoretical restoration of such premises defines the period of business interruption, even though full production actually resumes earlier at a different site.

Plaintiff argues the present situation is different from cases in the second category because full production resumed in the damaged premises rather than at a different site. Although we recognize the factual difference we believe the result must be the same.

A business interruption policy provides use and occupancy coverage tied to the insured premises. See Nickals v. Ohio Farmers Ins. Co., 237 F.Supp. 904, 907 (D.C.Cal.1965); 4 Appleman, Insurance Law and Practice § 2329 (1969). It is the effect of interruption of such use and occupancy on gross earnings of the business which is insured. Interruption of use and occupancy continues from the date of damage to the date of substantial restoration of the insured premises. Where the premises are actually restored, the period for computation of reduced gross earnings ends with such restoration unless that period exceeds the theoretical period of repair. Cf. Eureka-Security Fire & Marine Ins. Co. v. Simon, 1 Ariz.App. 274, 401 P.2d 759 (1965). The theoretical period defined in the policy is the length of time required with the exercise of due diligence and dispatch to rebuild, repair or replace the damaged premises. Where the actual restoration period exceeds the theoretical period or where the premises are not restored, the theoretical period becomes the computation period. In the present case the period of business interruption is the time it actually took to restore the insured premises.

This case is analogous to Northwestern States Portland Cement Co. v. Hartford F. I. Co., *supra*. There plaintiff had two adjacent cement plants. The kiln in one was rendered inoperable by fire for 33 days, causing a partial shutdown of one of the plants. However, at the time of the fire plaintiff had a large inventory of finished cement so it was able to make its usual sales and did not suffer any reduction in gross earnings. It did incur expense in making up the reduction in inventory by extra operation of the other plant. The court held the insurer's liability, under coverage identical to that in this case, was limited to the extra expense necessary to prevent loss of earnings: "[T]he purpose and intent of the policy provisions are to insure against loss of earnings, and * * * if there is no loss of earnings, liability is limited to the extra expense necessary to prevent loss of earnings." *Id.*, 360 F.2d at 533. The court also observed:

"Under the terms of Paragraph 3 the insured is not permitted to sit idly by during a business interruption but must take affirmative action to reduce the loss of earnings. It must reduce the loss resulting from the interruption of business, if possible, by partial or complete resumption of the business * * *. Such reduction is to be taken into account in arriving at the amount of loss. How it is to be taken into account is the subject of Paragraph 4.

" * * * The policies specifically state what is to be paid an insured for taking these required steps to prevent loss. Paragraph 4 provides the insured is to be compensated therefor by receiving such expenses, in excess of normal, as would necessarily be incurred * * *." *Id.* at 534.

In the present case plaintiff complied with paragraph 3 by first partial and then full resumption of operations in the damaged premises and by use of outside space. Extra expense in doing so was payable under paragraph 4. However, the fact the reduction in gross earnings was thereby lessened did not in itself shorten the period of business interruption. Apart from the

fact the parties stipulated the premises were not substantially restored until August 1, 1970, the best proof of continued interruption of use and occupancy is that the extra expense of $3189.56 was incurred between April 1, 1970, and August 1, 1970, for outside space rental and transportation, equipment and labor costs involved in using such outside space.

Although plaintiff hints its gain in gross earnings after April 1, 1970, is attributable to extra production expense, no claim for any such expense was included in the stipulation. Moreover, plaintiff's contention normalcy was restored April 1, 1970, but extra expense was required to prevent loss until August 1, 1970, is palpably inconsistent and specious.

We find the period of business interruption contemplated by the policies ended August 1, 1970, the date on which use and occupancy of the insured premises was restored. Trial court erred in holding otherwise.

 II. *Credit for abated expenses.* Trial court stated that if it adopted defendant's theory as to the period of loss, "defendants would not be entitled to the credit of $1288.00 and $8544.00 for the reason that no facts are contained in the stipulation or shown by any other evidence which would enable a determination of the amount of an abatement, if any, of payroll expenses for the period from February 6, 1970, through August 1, 1970." As previously noted $1288 was stipulated as abated payroll to April 1, 1970, and $8544 was the amount of reimbursed labor used in the salvage operation. Defendants maintain trial court's view is erroneous. We agree.

The parties agreed the $9832 constituted abated expenses, i. e. "charges and expenses which do not necessarily continue during the interruption of business" within the meaning of paragraph 2 of the business interruption form, which provides they are to be subtracted from reduced gross earnings in determining recovery. The fact these expenses abated prior to April 1,

1970, is immaterial. What is important is plaintiff agreed they were abated expenses. If there were additional abated expenses after April 1, 1970, the failure to establish them works in plaintiff's favor rather than defendants' since they reduce recovery. If there was extra payroll after April 1, 1970, such would be an expense to reduce loss under paragraph 4, and plaintiff did attribute $1547.80 of its extra expense to labor. Hence plaintiff receives credit for all extra labor claimed in the stipulation for the entire loss period.

Defendants are entitled to credit for the abated expenses of $9832 against the reduction in plaintiff's gross earnings for the period February 1, 1970, to August 1, 1970.

The case is reversed and remanded. Trial court shall recompute plaintiff's damages in accordance with defendants' contentions recited in the stipulation of the parties and enter judgment accordingly.

Reversed and remanded with instructions.

All Justices concur except LeGRAND, J., who dissents.