USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1530 CHARLES A. BIRBARA and DAVID G. MASSAD, Plaintiffs, Appellees, v. GORDON LOCKE ET AL., Defendants, Appellants, and TECHNOLOGY FINANCE GROUP, INC., Defendant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Alexander D. Widell, with whom Eugene R. Scheiman and Baer, Marks ____________________ __________________ ___________ & Upham LLP were on brief, for appellants. ___________ Roy A. Bourgeois, with whom Amato J. Bocchino and Bourgeois, __________________ ___________________ __________ Dresser & White were on brief, for appellees. _______________ ____________________ November 7, 1996 ____________________ LYNCH, Circuit Judge. Two sophisticated investors LYNCH, Circuit Judge. _____________ bought computer-lease tax shelters. The 1986 revisions to the Tax Code undercut the economic rationale for such tax shelters. As a result, the seller of the shelters, Technology Finance Group ("TFG"), later became insolvent and violated its investment contracts. A public company, Creative Resources, Inc. ("CRI"), acquired control of TFG, poured in money and attempted, unsuccessfully, to salvage the company. The two investors, plaintiffs here, sued TFG, its new parent and two individuals, officers of the parent, inter _____ alia, for TFG's breach of contract on a corporate veil ____ piercing theory. The investors obtained a jury verdict of $250,000.1 We reverse and vacate the verdict, finding the evidence insufficient to meet the strict standards Massachusetts has set for piercing the corporate veil. Facts _____ In 1986, plaintiffs Charles Birbara and David Massad each purchased a one-half ownership interest in a commercial computer from a subsidiary of TFG, a Delaware corporation that leased commercial equipment as tax shelters. In addition, Massad purchased a second computer from the TFG affiliate. These computers were subject to existing "user  ____________________ 1. With interest, this resulted in an award of $427,945.21. The court and jury rejected fraud, conversion and deceptive trade practices claims against the defendants. TFG has not appealed from the verdict against it. -2- 2 leases" with companies that had actual possession of the computers, as well as to the right of a TFG subsidiary to sell the computers when the leases expired. TFG was required to pay plaintiffs the proceeds of these sales, less certain fees. Following the enactment of the Tax Reform Act of 1986, TFG became unable to market its equipment leases and consequently could not generate adequate operating capital. In an effort to return the company to firm financial footing, Jerry Minsky, TFG's then-president and CEO, who is not a party to this suit, decided that TFG would not pay investors the proceeds from the sales of their equipment but rather would retain these funds, thereby violating the investment contracts. TFG continued to face financial problems. In 1989, CRI, a public Nevada corporation which owned several other businesses, acquired complete ownership of TFF, Inc., a Delaware corporation which owned all of TFG's outstanding common stock. CRI began taking steps to ameliorate TFG's financial problems. Gordon Locke and Dennis Williamson, members of the CRI Board of Directors' Executive Committee and CRI's only preferred shareholders, together invested $250,000 in CRI. CRI, in turn, made interest bearing loans to TFG, which were properly documented in the accounts of both companies. Locke and Williamson became executive vice presidents of TFG, for which Williamson received an annual -3- 3 salary of $206,250 and a monthly automobile allowance, and for which Locke received an annual salary of $187,500 and a monthly automobile allowance. In addition, TFG's by-laws were amended to curtail the power of the CEO, Minsky. CRI was careful to observe all the corporate formalities with respect to TFG. The two companies had different boards of directors and separate board meetings. Although, consistent with good accounting practice, CRI and TFG eventually had consolidated financial statements, each kept its own financial records. The new management of TFG decided to continue Minsky's policy of violating contracts with TFG investors by reselling equipment leases without paying investors the proceeds, believing that this was the only way to continue to improve TFG's financial health as well as to avoid favoring investors whose equipment had not been sold before TFG was acquired by CRI. CRI, however, did begin the process of offering to all of the investors whose contracts were violated a settlement package which included cash, notes, and CRI stock. One of TFG's numerous creditors took steps to attach a TFG bank account in Connecticut. TFG transferred funds out of this account into a TFG account in a Canadian -4- 4 bank in order to meet the payroll for TFG employees.2 For several months in 1990, Locke ran TFG's payroll out of his personal attorney operating account in New York and was reimbursed with funds transferred out of the TFG Canadian account. Eventually, in January 1991, CRI sold TFG. TFG owed CRI over one million dollars; this debt was forgiven at the time TFG was sold. Neither of the plaintiffs in this case ever had any direct dealings with CRI, Locke or Williamson. Both plaintiffs had a number of other tax shelter investments, and relied on David Levinson, their financial advisor, as to this investment. Indeed, Massad never even read the initial offering memorandum. Levinson first became aware of TFG's financial difficulties in February 1990, after calling TFG in preparation for a meeting with Birbara. On February 20, Levinson spoke to Locke, who told him that he was sure that plaintiffs' computers had been sold. Although Locke was not familiar with plaintiffs' machines, he indicated that all of the computers had been sold, and that he would try to determine exactly what had happened to plaintiffs' machines.  ____________________ 2. In both of his depositions taken before trial, Locke testified that it was his best recollection that the funds were transferred out of TFG's Connecticut account into a CRI account in Canada. However, at trial he testified that his recollection had been incorrect and bank statements were produced to substantiate his trial testimony. -5- 5 Levinson conveyed this information to plaintiffs, and in the next few days spoke to Locke or Williamson several times in an effort to find out more. Levinson knew he was speaking with Locke and Williamson in their capacities as TFG officers and was not confused about the various corporate relationships. On February 27, 1990, Williamson informed Levinson that the computer owned by plaintiffs jointly had been sold by prior management in October 1989, and the next day, Levinson was told that Massad's computer had also been sold in October 1989 by prior management. CRI, however, had taken control of TFG prior to the sale of the two computers, and thus the new management had been involved in these sales. Moreover, the bill of sale for Massad's computer dates from late February 1990, after Levinson's calls. Defendants contend that Massad's computer was actually sold in November 1989 by the company in possession (which later reimbursed TFG), and that the February bill of sale was simply an accounting between TFG and that other company. Defendants assert that this was a common industry practice. The jury would have been warranted in disbelieving defendants' claim that Massad's computer had been sold in November 1989. Levinson's telephone calls prompted Locke in early March to send each of the plaintiffs the settlement form letter on CRI stationery that he was in the process of -6- 6 sending out to all TFG investors. The letter provided in relevant part: Early last year this company acquired all the stock of Technology Finance Group, Inc. ("TFG") from which you purchased [an interest] in equipment as indicated in the attached Schedule A. At the end of June, 1989 management changed. This Company, and its subsidiary TFG, is now operated by new management. We, the new management have reviewed TFG's books and records and concluded, to the best of our knowledge, in relation to the equipment owned by you, that TFG owes you Additional Rent . . . . Regrettably, over the past 5 years, prior management of TFG has not remitted sums to owners of equipment to a total amount of approximately $7 Million. Further, we concluded, upon review of the financial statements of the Company . . . that TFG does not have the financial resources to repay these funds. . . . . Your concern and disappointment at the position in which you have been placed is extremely understandable. However, it is most important that you understand that the management responsible for the decisions not to pay you have resigned and that new management is concerned to provide you with the maximum economic benefit possible under the circumstances. The jury would have been warranted in finding that the statement that former management was responsible for the sales of plaintiffs' computers was not true. However, despite the misrepresentation, plaintiffs were not confused about the relationship between the corporate entities, nor did they take any action in reliance on the new management -7- 7 language in the letter. Although the majority of TFG's investors accepted the standard settlement package, plaintiffs declined to do so. Procedural History __________________ Plaintiffs, who are Massachusetts residents, filed this diversity suit in the District of Massachusetts in 1990, alleging breach of contract, common law fraud, conversion, interference with contractual obligations, and violation of the Massachusetts deceptive trade practices statute, Mass. Gen. L. ch. 93A, 2. Aware of TFG's precarious financial condition, the plaintiffs brought suit not only against TFG, but also against CRI, Locke, and Williamson. At the close of the evidence, the trial judge entered a directed verdict against the plaintiffs on the fraud claim concerning the computer they owned jointly. The defendants then moved, pursuant to Rule 50(a), for judgment as a matter of law on various grounds, including a lack of personal jurisdiction. The district court denied the motion, ruling that the personal jurisdiction issue had been waived, but even if it had not, that the jury could find the defendants had sufficient contacts with Massachusetts for a proper exercise of personal jurisdiction. The jury found for the defendants on the remaining fraud and interference with contractual relations claims, but for the plaintiffs on the -8- 8 breach of contract claim. The trial judge reserved decision on the Massachusetts deceptive trade practices claim. After the verdict, defendants again moved for judgment as a matter of law, pursuant to Rule 50(b). The trial court denied the motion. At the same time, it ruled that the defendants had not violated the Massachusetts deceptive trade practices statute, finding that the decision to breach the contract with the plaintiffs was a valid business judgment rather than an attempt on the part of the defendants to line their pockets. Personal Jurisdiction _____________________ The defendants question whether there is personal jurisdiction over them under the Massachusetts long arm statute, Mass. Gen. L. ch. 233A, 3, and the United States Constitution. The district court found that all three defendants had waived their objections to personal jurisdiction and that in any event, the jury could find that the defendants had sufficient contacts with Massachusetts for a proper exercise of jurisdiction. The trial judge was plainly correct that CRI waived any objection to jurisdiction: at the final pre-trial conference, defense counsel conceded there was no jurisdictional issue with respect to CRI. Because parties are, as a general matter, bound by the representations, concessions, and stipulations of their attorneys, United States v. Woburn City Athletic _____________ _____________________ -9- 9 Club, 928 F.2d 1, 6 (1st Cir. 1991), this express waiver is ____ dispositive on the issue of the trial court's jurisdiction over CRI. The matters of waiver and personal jurisdiction over the two individual defendants are far closer. Because we find that plaintiffs did not submit evidence sufficient to sustain their verdict on the merits, we pretermit resolution of the jurisdictional issue. See Norton v. Mathews, 427 U.S. ___ ______ _______ 524, 530-31, 96 S. Ct. 2771, 1773-76A, 49 L. Ed.2d 672 (1976) (where merits can be easily resolved in favor of the party challenging jurisdiction, resolution of complex and theoretical jurisdictional issue may be avoided); Menorah _______ Ins. Co., Ltd. v. INX Reinsurance Corp., 72 F.3d 218, 223 n.9 ______________ _____________________ (1st Cir. 1995). Piercing the Veil _________________ TFG admittedly violated its contract with plaintiffs, has not appealed and is liable to plaintiffs. TFG is insolvent and plaintiffs, as TFG's putative creditors, seek to have CRI, the corporate parent, and Locke and Williamson, individuals who were officers of both TFG and CRI, satisfy TFG's contractual obligations. Although corporate and individual defendants present slightly different questions, Pepsi Cola Metropolitan Co. v. Checkers, ___________________________ _________ Inc., 754 F.2d 10, 15-16 (1st Cir. 1985), the analyses are ____ -10- 10 sufficiently similar to warrant discussing them together,3 only distinguishing the two categories when necessary. Neither party disputes that Massachusetts law controls in this diversity action. Our review is de novo. We will only reverse if the evidence, when viewed in the light most favorable to the verdict, would allow a reasonable factfinder to come to only one conclusion -- that the moving party was entitled to a judgment in its favor. Conway v. ______ Electro Switch Corp., 825 F.2d 593, 598 (1st Cir. 1987). ____________________ Plaintiffs seek to make the corporate parent and two of its officers liable for the damages owed for breach of contract by a subsidiary.4 Specifically, CRI acquired 100%  ____________________ 3. The leading Massachusetts case on piercing the corporate veil, My Bread Baking Co. v. Cumberland Farms, Inc., 233 _____________________ _______________________ N.E.2d 748 (Mass. 1968), notes in dicta that a "corporation _____ or a person controlling a corporation and directing, or participating actively in its operations may become subject to civil or criminal liability on principles of agency or of causation," My Bread, 233 N.E.2d at 751 (citation omitted), _________ and this court has applied the same analysis to individual defendant shareholders as it has to defendant corporations. Pepsi Cola, 754 F.2d at 15-16. However, commentators have __________ noted that courts have evinced a "greater willingness to reach the assets of corporate as opposed to personal shareholders." Easterbrook & Fischel, The Economic Structure ______________________ of Corporate Law 56 & n.9 (1991); Hackney & Benson, _________________ Shareholder Liability for Inadequate Capital, 43 U. Pitt. L. _____________________________________________ Rev. 837, 873 (1982) (collecting cases); Hamilton, The ___ Corporate Entity, 49 Tex. L. Rev. 979, 992 (1971).  ________________ 4. That CRI acquired ownership of TFF, Inc. and thus of TFG in 1989 while plaintiffs entered in their contracts with TFG several years earlier in 1986 does not defeat plaintiffs' claim, because the actions leading to the breach of contract occurred in 1989 and 1990, after CRI had made the acquisition. Thus, this case does not involve an effort to hold a later parent responsible for the pre-parenthood -11- 11 of the stock of TFF, Inc., which in turn owned all of the common stock of TFG (but not its preferred stock). Thus, CRI was the parent once removed. To start, CRI is a publicly traded, not a closely held corporation. Caselaw and precedent elsewhere draw distinctions between close and public corporations, and the cases where courts have allowed creditors to reach the assets of shareholders have almost always involved close corporations. Easterbrook & Fischel, The Economic Structure _______________________ of Corporate Law 55-56 & n.8 (1991) (explaining that a __________________ "manager's incentive to undertake overly risky projects is greater in close corporations"). Massachusetts apparently has not yet addressed the issue of piercing the corporate veil of a public corporation. The key Massachusetts cases on piercing the corporate veil have all involved close, family- owned defendant corporations. In this silence, we will assume, dubitante, that Massachusetts would apply the same standards in deciding whether to pierce the corporate veil when the defendant is a public corporation as it has when the defendant is a close corporation. Further, this case concerns injured creditors of the subsidiary seeking to impose contract obligations on the  ____________________ activities of its new corporate child. See, e.g., C.M. Corp. _________ __________ v. Oberer Dev. Co., 631 F.2d 536, 539 (7th Cir. 1980) _________________ (parent's acquisition of subsidiary after breach of warranty renders analysis of relationship between two corporations irrelevant). -12- 12 parent and its officers. Several courts and commentators have suggested that it should be more difficult to pierce the veil in a contract case than in a tort case. See, e.g., _________ Edwards v. Minogram Indus., 730 F.2d 977, 980-984 (5th Cir. _______ _______________ 1984) (en banc); Blumberg, The Law of Corporate Groups: _______________________________ Substantive Law 17.01, 17.06, at 349-51, 359-60 (1987) ________________ ("[T]he underlying facts and policies in contract are often very different from those in tort . . . ."); Easterbrook & Fischel, supra, at 58 ("Courts are more willing to disregard _____ the corporate veil in tort than in contract cases."); Douglas & Shanks, Insulation from Liability Through Subsidiary _________________________________________________ Corporations, 39 Yale L.J. 193, 210-11 (1929). We have found ____________ no Massachusetts Supreme Judicial Court case applying the veil piercing doctrine in a contract case. The Appeals Court cases that do so have not addressed the question of whether it is more difficult to pierce the corporate veil in contract than in tort. E.g., Evans v. Multicon Const. Corp., 574 ____ _____ ______________________ N.E.2d 395, 400 (Mass. App. Ct. 1991), review denied, 577 ______________ N.E.2d 304 (Mass. 1991) (tbl.). We need not, however, resolve this issue, because we find that plaintiffs do not even meet the standard articulated by the Supreme Judicial Court in its seminal ruling on veil piercing in a tort case, My Bread Baking Co. ___________________ v. Cumberland Farms, Inc., 233 N.E.2d 748 (Mass. 1968). As a ______________________ preliminary matter, we note that "Massachusetts has been -13- 13 somewhat more 'strict' than other jurisdictions in respecting the separate entities of different corporations." My Bread, ________ 233 N.E.2d at 752. It is true that My Bread teaches that the principle ________ that corporations are generally to be regarded as distinct entities is not "of unlimited application": Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Id. at 751-52. The Supreme Judicial Court explained that it ___ is appropriate to depart from the general principle of corporate separateness: (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of "closely identified" corporations a court "need not consider with nicety which of them" ought to be held liable for the act of -14- 14 one corporation "for which the plaintiff deserves payment." Id. at 752 (citation omitted). However, in setting these ___ circumstances in context, the Supreme Judicial Court explained: Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity. Id. (internal citation omitted). ___ Since My Bread, in a variety of factual settings _________ (albeit none exactly analogous to this case), the Supreme Judicial Court has repeated that under Massachusetts law, the corporate veil will only be pierced in rare situations. Spaneas v. Travelers Indem. Co., 668 N.E.2d 325, 326 (Mass. _______ ____________________ 1996) (corporate veil will only be pierced to prevent gross inequity); Berger v. H.P. Hood, Inc., 624 N.E.2d 947, 950 ______ ________________ (Mass. 1993) (corporate form will be respected absent "compelling reason of equity" to do otherwise); Gurry v. _____ Cumberland Farms, Inc., 550 N.E.2d 127, 134 (Mass. 1990) _______________________ (same); Worcester Ins. Co. v. Fells Acres Day Sch., 558 ___________________ ______________________ N.E.2d 958, 968-69 (Mass. 1990) (noting the reluctance to disregard the corporate form); Commonwealth v. Beneficial ____________ __________ -15- 15 Fin. Co., 275 N.E.2d 33, 91 (Mass. 1971) (courts will only _________ look through the corporate veil to "accomplish . . . essential justice"), cert. denied, 407 U.S. 910 (1972) and ____________ ___ 407 U.S. 914 (1972); Gordon Chem. Co. v. Aetna Casualty & _________________ _________________ Surety Co., 266 N.E.2d 653, 657 (Mass. 1971); see also United __________ ________ ______ Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1091 ______________ _____________________ (1st Cir. 1992) ("Under Massachusetts common law, disregarding the corporate form is permissible only in rare situations."). We review the evidence in light of the two prong My __ Bread test, starting with the second prong. Plaintiffs _____ clearly did not meet their burden of showing by a preponderance of the evidence a "confused intermingling" of CRI's and TFG's activities with "substantial disregard of the separate nature of the corporate entities," or "serious ambiguity about the manner and capacity in which the [two] corporations and their respective representatives [were] acting." My Bread, 233 N.E.2d at 752. Defendants were ________ extremely careful about maintaining the formal distinctions between CRI and TFG. The two companies had distinct boards of directors, had separate board meetings, and each kept individual financial records. There is no evidence showing that TFG was a sham or merely a shield behind which CRI could hide to escape liability for its own obligations. Beneficial __________ -16- 16 Fin. Co., 275 N.E.2d at 91-92; Gordon Chem. Co., 266 N.E.2d ________ ________________ at 657. The primary evidence on which plaintiffs rely is TFG's movement of funds from a bank account in its own name in Connecticut into another TFG account in a Canadian bank in order to meet the payroll for TFG employees. For several months, defendant Locke ran TFG's payroll out of his own attorney operating account in New York because steps had been taken to attach TFG's Connecticut account. Locke was reimbursed with funds transferred out of the TFG Canadian account. It is undisputed that the funds disbursed by Locke and repaid by TFG went only to TFG employees. Plaintiffs were unaware of the transfers at the time and the transfers did not affect them. This is not the sort of "confused intermingling" we think the Supreme Judicial Court had in mind. Plaintiffs also argue that confused intermingling was evident from cash infusions into TFG by CRI, Locke and Williamson. However, all the money transferred from CRI to TFG was in the form of loans that were properly recorded in the financial records of both corporations. Moreover, there was insufficient competent evidence of transfers of money in -17- 17 the other direction, that is, from TFG to CRI.5 These loans do not support the claim of confused intermingling. Plaintiffs' argument that there was serious confusion about the manner and capacity in which the two corporations and their representatives acted is similarly unpersuasive. There is no evidence that there was any confusion about on whose behalf a director was acting in any given instance. Locke and Williamson, in their capacities as directors of both CRI and TFG, did sometimes act on behalf of both corporations simultaneously, but that is to be expected when individuals serve as directors for both a parent and its subsidiary. It is also to be expected that when a subsidiary company profits, the parent company will as well. That the fortunes of CRI and TFG were to some extent linked does not, as plaintiffs suggest, militate in favor of piercing the corporate veil. Plaintiffs admitted they were not misled about the relationship between TFG and CRI. Indeed, Massad did not even know that he had invested in TFG, let alone that CRI had become its parent. Plaintiffs neither knew nor cared about the relationship between CRI and TFG, but rather relied on their financial advisor, Levinson, who understood the corporate relationship.  ____________________ 5. The bank statements, the best evidence, show no transfers from TFG to CRI. -18- 18 As to the first prong of the My Bread test, the _________ evidence is only that Locke and Williamson served on the boards of both TFG and CRI. Mere overlapping of boards does not meet the test of "active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control." My Bread, 233 N.E.2d at ________ 752. Moreover, plaintiffs have failed to show any "fraudulent or injurious consequence of the intercorporate relationship." Plaintiffs argue that the settlement offers were misleading and fraudulent, because defendants attributed the decision to retain investment returns to TFG's prior management, when it had been the decision of the new management to continue the policy of violating investment contracts. Even assuming this misrepresentation might have supported fraud or unfair practices claims against the defendants (claims the jury and court here rejected), we think plaintiffs' argument misses the point of the corporate disregard doctrine. The phrase "fraudulent or injurious consequence" is limited in My Bread by the phrase "of the _________ intercorporate relationship." There was no failure to "make clear which corporation [was] taking action" or "to observe with care" the corporate form. My Bread, 233 N.E.2d at 752. ________ The Massachusetts Appeals Court has put this point well: "There is present in the cases which have looked through the -19- 19 corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing." Evans, 574 N.E.2d at 400;6 cf. Oman Int'l _____ ___ __________ Fin. Ltd. v. Hoiyong Gems Corp., 616 F. Supp. 351, 364 __________ ___________________ (D.R.I. 1985) (noting that the better reasoned cases under Rhode Island law only pierce the corporate veil when the injurious consequences are a direct result of the misuse of the corporate form). Plaintiffs were never misled about which corporate entity -- CRI or TFG -- was obligated to them or was dealing with them. Cf. Leatherbee Mortgage Co. v. ___ ________________________ Cohen, 638 N.E.2d 939, 940 (Mass. App. Ct. 1994); Massey's _____ ________ Plate Glass Co. v. Quinlan, 1992 WL 141885, at *3 (Mass. ________________ _______ Dist. Ct. 1992).  ____________________ 6. To the extent that the earlier Massachusetts Appeals Court decision in Bump v. Robbins, 509 N.E.2d 12 (Mass. App. ____ _______ Ct. 1987) could be read to the contrary, we believe it to be inconsistent with My Bread and effectively overruled by _________ Evans. See MCLE-NELI, Appellate Practice 108-13 (1980); _____ ___ ___________________ Henn, Civil Interlocutory Appellate Review Under G.L.M. ______________________________________________________ c.231, 118 & G.L.M. c.211, 3, 81 Mass. L. Rev. 24 (1996). ________________________________ Bump pierced the corporate veil despite the plaintiff's lack ____ of confusion about with whom he was dealing, based on the particular facts and circumstances of the case and the belief that My Bread does not "mak[e] such confusion an absolute ________ requirement." 509 N.E.2d at 24. Bump, which imposed ____ liability on a parent under Mass. Gen. L. ch. 93A, also involved findings of a de facto merger and an undisclosed principal and articulated its holding by stating that the parent "was liable on agency principles" for the conduct of its subsidiary. Id.  ___ -20- 20 As was said in Pepsi Cola, we believe the two prong __________ general analysis in My Bread is exemplary and does not _________ provide an exhaustive list of considerations. My Bread sets ________ the standard for deciding when to pierce the corporate veil under Massachusetts law; Pepsi Cola elucidates some factors ___________ that may be considered when engaging in a My Bread analysis. ________ Pepsi Cola, 754 F.2d at 15.7 The majority of the Pepsi Cola __________ __________ factors cut against piercing the corporate veil in this case. Plaintiffs largely based their case against the individual defendants on a theory that the two defendants ran TFG for their personal benefit -- that by drawing salaries and receiving certain benefits, the defendants were siphoning off corporate funds.8 But that theory is topsy-turvy: managers should not be put to the Hobson's choice of either working for free or facing personal liability. Such a rule would undercut, not advance, the policy reasons for the corporate disregard doctrine. See Evans, 574 N.E.2d at 399 ___ _____  ____________________ 7. These factors include insufficient capitalization, nonobservance of corporate formalities, failure to pay dividends, insolvency at the time of the litigated transaction, siphoning off corporate funds, absence of functioning officers besides the dominant shareholders, absence of corporate records, use of the corporation to advance the interests of the dominant shareholders, and use of the corporation in promoting fraud. Pepsi Cola, 754 F.2d __________ at 16. 8. In contrast to the situation in Pepsi Cola, 754 F.2d at __________ 14, there was no credible evidence of subterfuge or channeling excessive payments; nor was there any indication that the benefits were not part of a legitimate benefits plan. -21- 21 (benefit gained by individual defendants was a legitimate business purpose and so a factor pointing against veil piercing). Indeed, only one of the Pepsi Cola factors can ___________ arguably be said to militate in favor of veil piercing here: when plaintiffs' computers were sold, TFG was insolvent, unable to pay its debts as they fell due. However, considering TFG's insolvency in light of policies Massachusetts has sought to foster provides us with a different perspective. Evans, 574 N.E.2d at 399. The _____ Supreme Judicial Court has recently, in dicta, said of the _____ corporate disregard doctrine: [I]t relates to the quite distinct issue whether the effects of liability of one corporate entity should be visited upon a related entity. Corporate distinctness is respected as a means of limiting liability and thus fostering investment in corporate enterprises. Strom v. American Honda Motor Co., 667 N.E.2d 1137, 1145-46 _____ _________________________ (Mass. 1996). This case involves an attempt to impose liability on a new parent corporation and its officers for their efforts to salvage an insolvent, struggling business. TFG was not initially insufficiently capitalized for the purposes of its corporate endeavor and only became insolvent after a change in the tax laws. See Laborers Clean-Up Contract ___ ___________________________ Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d __________________ _____________________________ -22- 22 516, 525 (9th Cir. 1984) (distinguishing, in dicta, the _____ propriety of veil piercing when a subsidiary was undercapitalized at the outset from veil piercing when a subsidiary began with sufficient funds but subsequently fell upon hard times). The basic contract was entered into between plaintiffs and TFG, and TFG became insolvent before CRI assumed ownership. CRI bought TFG knowing that it was insolvent and pumped a great deal of money into TFG to try to make it profitable again. That TFG may have continued to be undercapitalized in these circumstances does not argue for piercing the corporate veil. Indeed, the contrary may well be true. This is not a case involving a close corporation where the parent may "form a subsidiary with minimal capitalization for the purpose of engaging in risky activities" and where absolute limited liability would create "incentives to engage in a socially excessive amount of risky activities." Easterbrook & Fischel, supra, at 57. Nor is _____ this a case of "financial misconduct of the subsidiary involving such manipulation as asset-stripping or asset- siphoning, which depletes the resources of the subsidiary." Blumberg, supra, 17.01, at 350. In sum, this is not that _____ "rare particular situation" where disregarding the corporate form is necessary "to prevent gross inequity." My Bread, 233 ________ N.E.2d at 752. -23- 23 Accordingly, after examining the case in the light most favorable to the verdict, we find the evidence insufficient to warrant piercing TFG's corporate veil to reach CRI's assets or the individual defendants' assets under the stringent requirements set forth by Massachusetts law. We reverse and vacate the jury verdict. -24- 24