**RONDOUT VALLEY CENTRAL SCHOOL DISTRICT,**
Plaintiff,

v.

The **CONECO CORPORATION, Boston Edison Company, Nstar, Bec Energy, Commonwealth Energy Systems, Bec Newco, Inc., and Boston Edison Technology Group, Inc. Defendants.**

No. 1:01–CV–1702 LEK/RFT.

United States District Court,
N.D. New York.

Sept. 29, 2004.

Raymond G. Kuntz, Office of Raymond G. Kuntz, Bedford Village, NY, for Plaintiff/Counter Defendant.

Robert S. McEwan, Jr., Nixon, Peabody Law Firm, Albany, NY, for Defendants/Counter Claimant.

### MEMORANDUM—DECISION AND ORDER [1]

KAHN, District Judge.

## I. BACKGROUND

The Court is now faced with opposing summary judgment motions in the above captioned matter. First, Plaintiff Rondout Valley Central School District ("RVCSD" or "School District") seeks summary judgment that Coneco Corporation ("Coneco") has breached the contract between them. Second, all of the defendants, except Coneco, seek summary judgment dismissing them as parties to this action. For the reasons that follow, each motion is granted in part and denied in part.

### (a) Basis of RVCSD's summary judgment motion

RVCSD filed the instant action alleging that Coneco breached its agreement under the parties' Guaranteed Savings Energy Management Agreement ("Agreement"),

---

1. For printed publication in the Federal Reporter.

which resulted in damages of over $3 million.[2]

On June 23, 1997, RVCSD and Coneco signed and entered into the Guaranteed Savings Energy Management Agreement ("Agreement"). No other corporate entities signed the Agreement under which, in an effort to reduce the School District's energy expenses, Coneco was to provide construction services, equipment installation, a lighting retrofit, energy savings management, asbestos abatement services, to RVCSD, with two schools receiving new roofs, as well.

RVCSD's summary judgment motion, which will be considered first, asks the Court to hold Coneco in breach because several installed components are not functioning properly, and Coneco has failed to provide energy management services and maintain other systems pursuant to the Agreement. RVCSD claims that it is undisputed that Coneco is in default because in answering the motion, "Coneco does not contend that it has fulfilled its obligations under the contract." RVCSD Mem. (Dkt. No. 58) at 4. Coneco, in replying to RVCSD's cross-motion for summary judgment, states that summary judgment is not appropriate because there are genuine issues of material fact. For example, Coneco claims that in pursuing a "massive school $15.1–million capital construction project," RVCSD violated the Agreement because "written approval for that project

was never obtained by plaintiff from Coneco ...." Coneco Mem. (Dkt. No. 59) at 3.

**(b) Basis of the Moving Defendants' summary judgment motion**

Because Coneco is now dissolved and insolvent,[3] Def. Statement of Facts (Dkt. No. 42) at ¶ 36, RVCSD asks the Court to pierce the corporate veils of Coneco's parent and affiliated corporations. Generally, RVCSD contends that it was misled to believe that a contract with Coneco is a contract with Boston Edison Company ("Boston Edison"), and as such, piercing the corporate veils to Boston Edison and its affiliated corporations is warranted.

RVCSD named Boston Edison as a defendant because at the time of the contract Coneco was a wholly owned subsidiary of Boston Edison and "officers of Defendant Boston Edison ... stated and represented to members of [the School District's] Board of Education that [Coneco] was financially secured by the assets of Defendant Boston Edison ...." Complaint (Dkt. No. 1) at ¶ 3. RVCSD named the remaining defendants, NSTAR, BEC Energy, Commonwealth Energy Systems, BEC Newco, Inc., and Boston Energy Technology Group, Inc.[4] ("BETG"), because they "are affiliated with or are successors in interest to [Coneco and Boston Edison] and are legally responsible for the antecedent debts of [Coneco] and Defendant

---

**2.** The Court has subject matter jurisdiction over this breach of contract action based on the complete diversity of the parties and because the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1332. Complaint (Dkt. No. 1) at ¶¶ 7–8; Answer (Dkt. No. 4) at ¶ 6. The Agreement provides that it "shall be governed under the laws of the State of New York without regard to the principles of conflict of law." Agreement (Dkt. No. 1, Ex. 1) at § 32.

**3.** RVCSD denied this statement in replying, but it appears that RVCSD disputes only the date that Coneco ceased operations, a date that is not material to the Court's discussion. RVCSD Reply Statement of Facts (Dkt. No. 56) at ¶ 36 (citing to Dkt. No. 56, Ex. 36).

**4.** The RVCSD listed this corporate defendant as Boston Edison Technology Group, Inc. However, the corporation's correct name is Boston Energy Technology Group. Answer (Dkt. No. 4) at n. 1.

Boston Edison Company." Complaint (Dkt. No. 1) at ¶ 5.

The second summary judgment motion that will be considered is filed by BETG, BEC Energy, Inc., Commonwealth Energy System, BEC Newco, Inc., NSTAR, and Boston Edison (collectively "Moving Defendants"). Notice of Motion (Dkt. No. 40).[5] Coneco was the only defendant to the action which does not join in this summary judgment motion. The Moving Defendants contend that summary judgment should be granted in their favor because they did not cause the damage suffered by RVCSD and, because the distinct corporate forms were strictly maintained, the Court should not pierce the corporate veils to reach their assets.

The facts that are material to the disposition of these motions will be stated in the discussions below.

## II. DISCUSSION

### (a) Standard of review

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, courts must "'resolve all ambiguities, and credit all factual inferences that

could rationally be drawn, in favor of the party opposing summary judgment.'" *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir.2001) (quoting *Cifra v. Gen. Elec., Co.*, 252 F.3d 205, 216 (2d Cir.2001)).

Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown*, 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990).

### (b) Breach of the Agreement

First, the Court will take up RVCSD's motion for summary judgment and determine whether either party breached its obligation under the Agreement, as the question of corporate liability, the basis of the Moving Defendants' summary judgment motion, is only relevant if there was a breach.

#### (1) *Coneco's breach*

The Court will first consider whether Coneco breached its contractual obli-

---

**5.** The docket in this action is in slight disarray, mainly due to Defendants improperly filing each document in support of their motion as its own docket entry. The original motion for summary judgment by the Moving Defendants was Dkt. No. 40, and in a separate docket entry, the corresponding memorandum of law is Dkt. No. 41. RVCSD's cross-motion for summary judgment and response to the Moving Defendants' summary judgment motion is Dkt. No. 56. Coneco's Memo-

randum in response to the cross-motion for summary is Dkt. No. 59. Mysteriously, Plaintiff's Reply to Coneco is Dkt. No. 58. The Moving Defendants reply memo is Dkt. No. 51. Plaintiff filed a surreply, without identifying it as such, in Dkt. No. 57. However, because the original summary judgment motion was filed by the Moving Defendants, under Local Rule 7.1(b)(1), Plaintiffs are not permitted to file a surreply without leave of the Court. No leave was requested.

gations to RVCSD. Actions constituting Coneco's default are provided for in Section 25.2 of the Agreement:

A. The standard of service and comfort set forth in "Schedule G" are not provided due to failure of CONECO to maintain, repair, or adjust the Equipment as set forth in "Schedule A", "Monitoring and Reporting Agreement", and said failure continues for thirty (30) days after written notice to CONECO without good faith effort by CONECO to make the necessary repairs or adjustments.

B. Any representation or warranty furnished by CONECO in this Agreement is false or misleading in material respect when made; and

C. Any other material failure of CONECO to perform or comply with the terms and conditions of this Agreement, including breach of any covenant contained herein, provided that such failure continues for thirty (30) days, after written notice to CONECO demanding that such failure to perform be cured or, if cure cannot be affected in such thirty (30) days, without commencement of a cure and subsequent completion thereof as quickly as is reasonably possible.

RVCSD's complaint lists the contractual obligations that Coneco has allegedly breached: (1) the co-generators never worked correctly, and Coneco has failed to repair them, (2) Coneco failed to maintain the air-handling units, (3) "Coneco has failed to maintain other systems in the District as specified by the terms of the Contract, [which] has resulted in additional expense to the District both in maintenance costs and the loss of energy efficiency," (4) Coneco has failed to provide energy management services, and (5) Coneco has failed to replace faulty lights installed in the lighting retrofit. Complaint (Dkt. No. 1) at ¶ 44.

To comply with the notice provision of Section 25 of the Agreement, on October 15, 1999 and May 10, 2000, RVCSD sent written notices to Coneco that it was in default of the Agreement. Letter of Marilyn O. Pirkle (Dkt. No. 58, Attached to Affirmation of Leah Murphy as Ex. B); Letter of Mario Spagnuolo (Dkt. No. 58, Attached to Affirmation of Leah Murphy as Ex. A).

#### (i) Co-generators

Pursuant to the Agreement, co-generators were to be installed at Rondout Valley High School and Rondout Valley Middle School. Agreement (Dkt. No. 1, Ex. A) at Schedule G. Donald Gilligan, Coneco's 30(b)(6) deponent, testified that the installed co-generator units "functioned[,] though intermittently." Gilligan Dep. Tr. (Dkt. No. 56, Ex. 8) at 62. The question, then, is whether installation of "intermittently" working co-generators satisfies Coneco's obligation under the Agreement.

The Agreement provides a "Co–Generation Warrantee [sic]" which states, in the first paragraph:

Coneco warrants that all materials installed shall be new high quality equipment, which meet or exceed industry standards. *Coneco shall insure that all materials are free from defect at the time of installation.*

Agreement (Dkt. No. 1, Ex. A) at Schedule A2 (emphasis added).

■ As evidence that it fulfilled its obligations to install co-generators that were free from defect at the time of installation, Coneco points to the "Certificate of substantial completion" that RVCSD signed. (Dkt. No. 60, Ex. AA). Some courts have held that execution of a certificate of substantial completion does not necessarily indicate "acceptance." *See, e.g., In re Rokmin,* 164 F.3d 619, 1998 WL 716577, *1 (2d Cir.1998) (upholding lower court's

ruling that "the certificates of substantial completion ... did not signal final acceptance by the owner"). However, in the present case, the Agreement refers to the certificate as a "Certificate of Substantial Completion and *Acceptance*".[6] Agreement (Dkt. No. 1, Ex. A) at § 5.2 (emphasis added). Moreover, the certificate specifically states that its execution signifies that "the [S]chool [D]istrict can occupy or utilize the project, except designated portions thereof, for the use for which it was intended." (Dkt. No. 60, Ex. AA). Such language indicates that upon installation, RVCSD accepted the work, and the co-generators initially operated as required, thus satisfying the first paragraph of the "co-generation warrantee [sic]" provided in Schedule A2, as cited above.

■ The parties dispute who was to perform the extended maintenance on the co-generators. If Coneco was to maintain the units after installation, then it has breached its obligation by allowing the co-generators to operate only "intermittently." However, if RVCSD is responsible for their long term maintenance, then Coneco has not breached its obligations by failing to keep them in repair. With respect to the extended maintenance of the co-generators, the second paragraph of the "Co-generation Warrantee [sic]" in Schedule A2 provides that:

> All material and equipment installed in connection with the Project shall be covered under an extended maintenance Contract for the duration of the [Agreement]. Agreement (Dkt. No. 1, Ex. A) at Schedule A2.

Not surprisingly, both Coneco and RVCSD point to other provisions in the Agreement in an attempt to impute the extended maintenance warranty of Schedule A2 to the other party.

Coneco contends that this statement alone provides "no indication ... as to which party will procure such extended maintenance contracts," Coneco Mem. (Dkt. No. 59) at 8, but goes on to point to §§ 8, 14, and Schedule H to support its position that RVCSD is charged with the co-generators' extended maintenance.

Coneco claims that RVCSD is responsible for procuring the extended maintenance contract mentioned in Schedule A2 because the Agreement indicates that "[c]ustomer [RVCSD] agrees that it shall adhere to, follow, and implement the procedures and... maintenance set forth in 'Schedule A2' and 'Schedule H'...." Agreement (Dkt. No. 1, Ex. A) at § 8. This statement does not indicate, though, whether RVCSD must implement maintenance services itself or simply allow the work to be performed by an outside entity, such as Coneco, at its facilities.

Coneco also points to Schedule H, which is entitled "Customer Support Responsibilities." Schedule H states that the "customer [RVCSD] agrees to provide the following information and undertake the actions listed" which includes "[o]ngoing, for the term of the [A]greement ... [r]eplacement/repair of equipment damaged, stolen, or vandalized" and also "[r]equired maintenance of equipment." Agreement (Dkt. No. 1, Ex. A) at Schedule H. Schedule H seems to impute some maintenance obligations to RVCSD, but the provision is unclear as to what the "required maintenance" was and whether RVCSD had an affirmative obligation to perform such maintenance or simply provide information to Coneco when such actions were necessary.

---

**6.** The Certificate itself does not include the word "Acceptance" in its heading, but rather, is only entitled "Certificate of Substantial Completion." However, the parties knew that it was being signed for the purpose indicated in the Agreement, including acceptance.

Finally, Coneco relies on Section 14 of the Agreement in support of its position that RVCSD is responsible for the extended maintenance of the co-generators. This section, entitled "Warranty" states that "Customer [RVCSD] shall incur no cost for service, repairs, or adjustments to the equipment for a *one year period* commencing on the execution of [the Certificate of Substantial Completion and Acceptance]." Agreement (Dkt. No. 1, Ex. A) at § 14 (emphasis added). Coneco reasonably posits that this provision indicates that it had maintenance obligations for only one year, and thereafter, maintenance responsibilities became RVCSD's. This statement alone does not support Coneco's position that RVCSD is liable for the failure of the co-generators, though, because a question of fact remains, namely, whether the co-generators failed prior to the expiration of the one year period.

RVCSD, of course, contends that the long term maintenance of the co-generators is imputed to Coneco under the Agreement, pointing to Coneco's own admissions, and its failure to so comply is a breach. As RVCSD first points out, it is "nonsensical" that "[RVCSD] entered into the Agreement with [Coneco] and that [RVCSD] agreed to provide [to itself] extended warranties for 15 years." RVCSD Mem. (Dkt. No. 58) at 6. Additionally, Coneco, without specifying the nature of the services, has admitted that it was required to perform certain maintenance services. Coneco's Reply Statement of Facts (Dkt. No. 61) at ¶ 7 ("The project record indicates that Coneco provided maintenance serves *as required by the [Agreement]* until approximately the end of year 2000") (citations omitted) (emphasis added). Co-

neco has also admitted that there are services that will come due in the future which it will not perform. *Id.* In fact, in its brief opposing RVCSD's summary judgment motion, Coneco characterizes the Agreement as one "for construction-related activities, *maintenance obligations,* and an energy savings guaranty." Coneco Mem. (Dkt. No. 59) at 7 (emphasis added). Finally, in a memorandum that Philippe Frangules sent to Donald Gilligan,[7] dated December 1, 1998, Mr. Frangules wrote that the project was:

> [N]ot producing guaranteed savings, because the cogen system is not working consistently. Cogen system under warranty, and negotiations with the manufacturer are underway. *Substantial maintenance expenses apparently not budgeted.* No escrowed funds to cover maintenance costs."

Dkt. No. 56, Ex. 35 (emphasis added).

These admissions lend support to RVCSD's position that the Agreement intended that Coneco would provide extended maintenance for the co-generators.

There are other provisions in the Agreement that are relevant to this discussion, although not discussed in detail by the parties. For example, the Agreement also specifies that "Customer [RVCSD] shall provide access to the Facilities for Coneco and its contractors or subcontractors during regular business hours, or such other hours as may be agreed upon by Coneco and Customer, in order to fulfill Coneco's obligations to install and complete the requirements of 'Schedule D' and 'Schedule G' hereof and for the continued operation, maintenance, and repair of the equipment

---

7. Philippe Frangules worked at Boston Edison from 1990 through 1994, when he went to BETG, and returned to Boston Edison in 1997. Frangules Tr. (Dkt. No. 56, Ex. 12) at 10–13. Donald Gilligan was a founder of Coneco and its president until 1996. Gilligan Tr. (Dkt. No. 56, Ex. G) at 6–7. He left Coneco in 1998. *Id.* During that entire time he was a Director of Coneco. *Id.*

subsequent to the completion of installation." Agreement (Dkt. No. 1, Ex. A) at § 12.

In contrast, the Energy Savings Guarantee [sic] Certificate in Schedule F implies that RVCSD will perform the extended maintenance mentioned in Schedule A2, because it states that the energy savings guaranty provided by Coneco will be canceled upon "Customer [RVCSD's] failure to *maintain* the Projects [sic] equipment as agreed in 'Schedule A2'... (if Customer [RVCSD] elects to maintain Projects [sic] equipment)." Agreement (Dkt. No. 1, Ex. A) at Schedule F, ¶ 4.

In the present case, as a matter of law, the Agreement is ambiguous with respect to which party is obligated to provide extended maintenance of the co-generators because, as explained above, the extended maintenance is imputed to RVCSD in some provisions and to Coneco in others. *See AFBT–II, L.L.C. v. Country Vill. on Mooney Pond, Inc.,* 305 A.D.2d 340, 341–42, 759 N.Y.S.2d 149 (2d Dep't 2003) (explaining that whether the meaning of a contract term is ambiguous is a question of law for the court) (citations omitted). The interpretation of this ambiguous provision is, therefore, a question of fact, one which, as explained above, the parties dispute. *See Manchester Tech., Inc. v. Didata, Inc.,* 303 A.D.2d 726, 757 N.Y.S.2d 439 (2d Dep't 2003) (" 'While the meaning of a contract is ordinarily a question of law, when a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact.' ") (citations omitted).

■ When there is an ambiguous contract provision, the meaning of which becomes an issue of fact, summary judgment must be denied. *See, e.g., Envtl. Safety & Control Corp. v. Board of Educ., Camden Cent. Sch. Dist.,* 179 A.D.2d 1012, 580 N.Y.S.2d 595 (4th Dep't 1992) (denying summary judgment where question of fact remained based on ambiguity in contract provision relating to the amount of asbestos abatement work that was to be performed for the school district). From the submissions of the parties, the Court cannot resolve this factual question. The Agreement provisions are ambiguous, and, significantly, neither party has submitted the "extended maintenance Contract" that was referenced in Schedule A2 of the Agreement, if, in fact, one exists. Even if no "extended maintenance Contract" exists, there is still a question of fact, because the Agreement's provisions are ambiguous as to which party was obliged to enter into such a Contract. Therefore, because a question of a material fact remains based on the ambiguous warranty provision in Schedule A2 of the Agreement, summary judgment is not warranted.

### (ii) Air handling units

■ The Agreement required that "Multi–Zone Roof Top Air Handlers" be installed into Rondout Valley Middle School and Rosendale Elementary. Agreement (Dkt. No. 1, Ex. A) at Schedule G. In its complaint, RVCSD alleges that "Coneco has failed to maintain the air-handling units. Although Coneco did not install these units, Coneco was required to maintain these units. Presently all of the units need to be replaced." Complaint (Dkt. No. 1) at ¶ 44(b). Schedule A2 provides a warranty for the "Central Air-Handling Units":

> Coneco warrants that all materials installed shall be new high quality equipment, which meet or exceed industry standards. Coneco shall insure that all materials are free from defect at the time of installation.

All manufacturers warrantees [sic] shall be in effect from the time of installation to the published expiration date of such warranties.

Agreement (Dkt. No. 1, Ex. A) at Schedule A2.

RVCSD signed the Certificate of Substantial Completion, which, as explained above, is the School District's acknowledgment that the air-handling units initially operated as required. As for the extended maintenance, Coneco points to the testimony of RVCSD's 30(b)(6) witness, Jerome Plaza, who stated that the Agreement required RVCSD to maintain the units *after* manufacturers' warranties expired. Plaza Tr. (Dkt. No. 56, Ex. 6) at 171. Plaza also asserted, however, that Coneco "never corrected" all of the problems with the units. *Id.* Therefore, because there is a remaining question of fact whether the air-handling units were malfunctioning prior to the expiration of the manufacturers' warranties, it is not clear which party was responsible for their repair. As such, summary judgment must be denied.

**(iii) Energy management services**

With respect to RVCSD's claim that Coneco has failed to provide energy management services pursuant to the Agreement, no questions of fact remain—Coneco breached its obligation.

Pursuant to the Agreement, "Energy Management System" work was to be performed at Rondout Valley High School, Kerhonkson Elementary, Marbeltown Elementary, Rondout Valley Middle School, and Rosendale Elementary. Agreement (Dkt. No. 1, Ex. A) at Schedule G. The Agreement does not define "energy management services," nor does Schedule G fully explain Coneco's obligations, but simply references "the existing energy management Control System Point Schedule identified in the Sear–Brown Specifications for [RVCSD] Energy Performance Con-

tract... dated February 1997 ...." *Id.* at Schedule G "Scope of Work." That document was not submitted to the Court.

Coneco's expert explains that the Direct Digital Control System [DDC] "is not ... another term for an energy management system, but it is ... a discrete portion of an energy management system." Coneco's Expert Report (Dkt. No. 57: Attached as Exhibit B to Affirmation of Mario Spagnuolo) at 32. Therefore, the DDC is, at the least, part of the energy management system.

Once again, Schedule A2, which memorializes the parties' maintenance and extended warranty agreement, provides a "Direct Digital Control System Warrantee [sic]" as follows:

Coneco warrants that all materials installed shall be new high quality equipment, which meet or exceed industry standards. Coneco shall insure that all materials are free from defect at the time of installation.

All manufacturers warrantees [sic] shall be in effect from the time of installation to the published expiration date of such warranties.

All material and equipment installed in connection with the Project shall be covered under an extended maintenance Contract for the duration of the [Agreement].

Agreement (Dkt. No. 1, Ex. A) at Schedule A2.

As in the previous discussion, there is a question as to which party is required to perform the extended maintenance under this provision. Once again, neither party has submitted a copy of the manufacturers' warranties nor an "extended maintenance Contract," if, in fact, one exists.

■ The admissions of Coneco are instructive on this point. Coneco ac-

knowledges that it "has not provided maintenance services to the DDC system installed at the RVCSD under the Agreement since 2000 ...." Coneco's Reply Statement of Facts (Dkt. No. 61) at ¶8. Coneco, though, "does not admit that it had any obligation to [perform energy management services after 2000]." *Id.* Interestingly, Coneco does not explain why it provided maintenance services to the DDC until the year 2000 if it believed that the Agreement did not obligate it to do so. The performance of those services through the year 2000 acts as an admission that the parties intended Coneco to perform energy management services to, at least, the DDC. *See Coliseum Towers Assocs. v. County of Nassau,* 2 A.D.3d 562, 769 N.Y.S.2d 293, 296 (2d Dep't 2003) (holding that evidence of payment of land taxes by defendant without protest for seven years is "probative evidence of the parties' intent that [defendant] was obligated to pay land taxes"); *Fed. Ins. Co. v. America's Ins. Co.,* 258 A.D.2d 39, 691 N.Y.S.2d 508, 512 (1st Dep't 1999) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties .... 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'") (citations omitted).

Coneco has admitted that "since Coneco dissolved in January, 2001, it is unlikely that Coneco will perform any obligations that come due under the Agreement ...." Coneco's Reply Statement of Facts (Dkt. No. 61) at ¶7. By admitting that it has not provided required services since 2000 and acknowledging that it will not provide such services in the future, there is little ques-tion that Coneco has breached is obligation under the Agreement to provide maintenance to the DDC and energy management services.

#### (iv) Lighting retrofit

■ In its complaint, RVCSD also alleges that Coneco is in breach because it "failed to replace faulty lights installed in the lighting retrofit." Complaint (Dkt. No. 1) at ¶44(e). Pursuant to the Agreement, lighting retrofit work was to be completed at Rondout Valley High School, Kerhonkson Elementary, Marbeltown Elementary, Rondout Valley Middle School, and Rosendale Elementary. Agreement (Dkt. No. 1, Ex. A) at Schedule G.

Schedule A2 provides the "Lighting Warrantee [sic]":

Coneco warrants that all materials installed shall be new high quality equipment, which meet or exceed industry standards. Coneco shall insure that all materials are free from defect at the time of installation.

All material and equipment installed in connection with the Project shall be covered under an extended maintenance Contract for the duration of the [Agreement]. This extended warrantee [sic] also covers a complete light tube change-out in the fifth year and the tenth year.

Agreement (Dkt. No. 1, Ex. A) at Schedule A2.

For the reasons set forth above, RVCSD's signing of the Certificate of Substantial Completion was intended by the parties to be acceptance of the work initially performed, including installation of the lighting retrofit. However, as discussed above, the warranty is ambiguous with respect to the extended maintenance of the lighting retrofit. Similar to the warranty provisions for the co-generators, DDC, and air-handling units, the Agreement refer-

ences an "extended maintenance Contract" for the lighting work, but neither party has submitted it, nor discussed what was contemplated therein. Moreover, the Agreement has provisions that suggest that RVCSD is obligated to provide the maintenance warranties in Schedule A2, and other provisions that suggest that it is Coneco that has that same obligation. Because the meaning of this ambiguous provision in the Agreement is a question of fact, and that question is disputed by the parties, summary judgment is properly denied.[8]

### (2) *RVCSD's breach*

Coneco contends that questions of fact exist which preclude granting RVCSD's motion for summary judgment. As considered above, Coneco claims that the Agreement imputed extended maintenance obligations to RVCSD. Although Coneco has not moved for summary judgment, it contends that "it is [RVCSD] which has failed to live up to its obligations under the Agreement," Coneco Mem. (Dkt. No. 59) at 9, because (1) RVCSD has not paid in full under the Agreement, and (2) without obtaining Coneco's required permission, RVCSD pursued a capital construction project that impacted the annual energy savings which Coneco was entitled to share.

### (i) RVCSD has not paid in full under the Agreement

■ Coneco claims that RVCSD breached the Agreement because it has not paid in full. The Agreement stipulated to a base compensation for Coneco's performance of $6,175,390.00. Agreement (Dkt. No. 1, Ex. A) at § 7.1. Coneco contends that it is owed more than this figure because "there was work performed under change orders that increased the contract amount." Coneco's Reply Statement of Facts (Dkt. No. 61) at ¶ 5. To support its position that it is due additional payment based on the "change orders," Coneco has submitted those alleged change orders which state that they are "[n]ot valid until signed by the Owner, Architect and Contractor." (Dkt. No. 60, Ex. GG). However, the orders it submitted are all conspicuously blank where RVCSD was to sign and indicate its approval.[9] Therefore, because there is no signed agreement between the parties with respect to these change orders, and no admission from RVCSD that the work was completed, Coneco is not entitled to payment under those orders.

■ Coneco also contends that it was not paid in full because RVCSD failed to remit $172,806 of the original Agreement price, in accordance with an invoice dated August 25, 1998. Aug. 25 Invoice (Dkt.

8. In its complaint, RVCSD claims that "Coneco has failed to maintain other systems ... as specified by the terms of the [Agreement]. This failure has resulted in additional expense to [RVCSD] both in maintenance costs and the loss of energy efficiency." Complaint (Dkt. No. 1) at ¶ 44(c). During deposition of its 30(b)(6) witness, RVCSD explained which "other systems" Coneco has failed to maintain, including the lighting retrofit, co-generators, boiler cleaning maintenance, and services for the automatic temperature controls. Plaza Tr. (Dkt. No. 56, Ex. 6) at 174–175. However, there is no further discussion of these allegations in RVCSD's brief.

9. In addition to Coneco representative Gerald McGovern, William Christofaro, P.E. of the Sear–Brown Group, which is the architect for RVCSD, signed the change orders. Because there is no evidence that he was an agent of RVCSD, his approval cannot bind RVCSD. Mr. Christofaro was unsure whether RVCSD had approved the change orders. He also could not state for certain whether the work of the change orders had been completed. Christofaro Tr. (Dkt. No. 60, Ex. FF) at 83–91. Coneco cites to no testimony from RVCSD which indicates that it accepted those orders.

No. 60, Ex. EE). Coneco explained that "[a]lthough Frank Ruggiero, the former assistant superintendent for finance and technology for RVCSD, authorized payment of the referenced invoice, Mr. Plaza blocked payment of the invoiced amount and testified at deposition that it was never paid." Coneco Mem. (Dkt. No. 59) at 10. The invoice includes handwritten notes by Mr. Plaza and Mr. Ruggiero that so indicate. (Dkt. No. 60, Ex. EE); Plaza Tr. (Dkt. No. 56, Ex. 6) at 146–149. Mr. Plaza acknowledged that RVCSD "didn't pay the full payment," but that was only because the co-generators were not operational, and therefore, the work was not complete. Plaza Tr. (Dkt. No. 56, Ex. 6) at 148–49.[10]

■ Only if the Agreement was fully performed is Coneco entitled to full payment. *In re U.S. Air Duct Corp.*, 38 B.R. 1008, 1019 (N.D.N.Y.1984) ("To recover the entire contract price, the plaintiff must demonstrate full performance on its part.") (citing to N.Y.Jur.2d Contracts § 308). If Coneco's obligations under the Agreement were substantially performed, then it is entitled to the total Agreement price, less the cost to complete the defective work. *Id.* As explained above, there are questions of fact as to whether Coneco performed as required by the Agreement, namely, whether it has fulfilled the maintenance obligations that RVCSD is allegedly due under the Agreement. Therefore, there is also a question of fact that remains as to whether it was entitled to its full payment from RVCSD. Accordingly, the Court cannot hold that RVCSD breached its obligation by failing to so pay.

### (ii) RVCSD's capital project on its facilities

■ The Agreement provides that Coneco is entitled to share in annual energy savings realized by RVCSD that exceed $157,320. Agreement (Dkt. No. 1, Ex. A) at § 7, Schedule F.[11] Coneco contends that by going forward with a "massive school capital construction project," RVCSD breached the Agreement because it had an obligation to obtain Coneco's written permission prior to undertaking any project that may impact the energy savings. Coneco Mem. (Dkt. No. 59) at 11. Coneco states that "despite [RVCSD's] obligation to obtain Coneco's written permission to move ahead with the construction project, it failed to do so, frustrating the purposes of the Agreement and Coneco's right to share in energy savings." *Id.* at 11–12.

The Agreement provides that the energy savings guaranty "will be canceled if ... [there is] [a]ny alteration in the Projects not authorized in writing by Coneco." Agreement (Dkt. No. 1, Ex. A) at Schedule F. The "Projects" refers to the "energy conservation projects" which includes, in relevant part, the co-generators, the ener-

10. RVCSD states that "it is undisputed and affirmed by Coneco's own 30(b)(6) witness, Mr. Donald Gilligan that [RVCSD] had adequately performed its obligation to pay the contract sum ...." RVCSD Mem. (Dkt. No. 58) at 3. RVCSD did not provide a citation to Mr. Gilligan's deposition testimony where he made such a statement. Upon a review of Mr. Gilligan's testimony, the Court can only ascertain that he stated that he "do[es]n't know" whether Coneco was owed money by RVCSD. Gilligan Tr. (Dkt. No. 45, Ex. G) at 66.

11. Coneco states that it is entitled to share in any annual energy savings above the threshold amount of $157,320. Coneco Mem. (Dkt. No. 59) at 11. However, the parties executed an addendum to the Agreement on June 24, 1997, which revised that figure and listed a "New Annual Guaranteed Savings Number" of $144,220. Agreement (Dkt. No. 1, Ex. A) at Addendum I. The Court will not discuss which figure is to be used here, because damages are not at issue in the present summary judgment motions.

gy management systems, and the lighting retrofit. *Id.* at Schedules A2 and G.[12]

Coneco cannot now posit that going forward with this project was a breach of RVCSD's obligations under the Agreement, because such a contention is inconsistent with Coneco's actions. On May 10, 2000, RVCSD sent Coneco a letter informing the corporation that the School District was planning a capital construction program. Letter from RVCSD's counsel (Dkt. No. 60, Ex. DD). Therein, RVCSD stated that because the capital construction project *"may* effect [sic] energy consumption" in the designated facilities, the parties "should schedule a meeting to determine the effect, if any, this project has on the energy savings guarantee [sic]." *Id.* (emphasis added). It appears that Coneco failed to engage in those discussions.

Based on the May 10th letter, though, it is clear that, at the very least, Coneco was informed that the capital project was being planned and that RVCSD sought its input on that project. Coneco, however, has not submitted any evidence that it ever objected to the project nor did it ever provide written notice to RVCSD that its capital construction project would render it in default of the Agreement. Absent written notice of default to RVCSD as required in Section 25.1(C), RVCSD cannot be found in default of the Agreement. That provision mandates that RVCSD is in default only if "such failure [to comply with the Agreement] continues for thirty (30) days after written notice to RVCSD demanding that such failure to perform be cured or, if cure cannot be affected in such thirty (30) days, without commencement of a cure and subsequent completion thereof as quickly as is reasonably possible." Agreement (Dkt. No. 1, Ex. A) at § 25.1(C).

In the present case, because RVCSD never received written notice that it was in default, it never had the allotted thirty days in which to cure, precluding a finding that it defaulted on the Agreement. *See Putman High Yield Trust v. Bank of N.Y.,* 7 A.D.3d 439, 776 N.Y.S.2d 796 (1st Dep't 2004) (holding that defendant had no obligation to act to cure default absent receipt of a written notice of default); *Carnegie Successors, Inc. v. Frances Gross,* 166 A.D.2d 224, 560 N.Y.S.2d 436 (1st Dep't 1990) (holding that 10 days written notice for default was required to be given under the contract and failure to do so precluded seller from repudiating the contract); *Envtl. Safety & Control Corp.,* 179 A.D.2d at 1013, 580 N.Y.S.2d 595 (ordering breach of contract counterclaims dismissed where defendant failed to comply with the condition precedent of providing written notice for breach of contract). RVCSD cannot be found in breach when it complied with the Agreement and was never given notice of its alleged default.

Therefore, Coneco has breached its obligations under the Agreement to provide energy management services. RVCSD's and Coneco's remaining claims involve questions of material fact that preclude the

---

**12.** RVCSD contends that the "written authorization" provision cited here is not the proper standard. Rather, it cites to a different provision which states that the guaranty will be cancelled if RVCSD fails "to inform Coneco in writing or [sic] any significant... change in [RVCSD] facility operational variables...." Agreement (Dkt. No. 1, Ex. A) at Schedule F, ¶ 3. Therefore, RVCSD contends that it only had to notify Coneco of the planned project because while it would alter the energy savings guaranty, it was not a change in the "Project" that would require Coneco's written authorization referred to in ¶ 1. Whether the capital construction project would be a change to the "Project" is a fact that is in dispute. However, the fact is not material, because no matter which provision is relied upon, there is no merit to Coneco's contention that RVCSD is in breach for the reasons set forth in this discussion.

grant of summary judgment. Having determined that Coneco has breached at least some of its obligations to RVCSD for which damages may be awarded, the Court's must next address the Moving Defendants' motion for summary judgment, to determine whether their corporate veils should be pierced rendering them liable to RVCSD for any damages incurred.

### (c) Liability of the Moving Defendants

The Moving Defendants seek summary judgment because (1) they did not cause or contribute to the damages accrued by RVCSD, (2) there is no basis upon which to pierce the corporate veil, and (3) Coneco did not have the authority, either actual or apparent, to bind any of the moving defendants to the Agreement. RVCSD disputes these statements and seeks damages from all defendants, contending (1) that it is proper to pierce the corporate veil because Coneco was "a mere instrumentality" of the Moving Defendants, RVCSD Mem. (Dkt. No. 56) at 6, and (2) that Coneco had both apparent and actual authority to act on behalf of the Moving Defendants and, therefore, they should be held liable to RVCSD.

#### (1) *Choice of law*

As an initial matter, in their submissions, the parties rely on the law of different jurisdictions in analyzing whether the corporate veils should be pierced. Coneco and the Moving Defendants rely on the law of Massachusetts, the state of incorporation of Coneco, Boston Edison, and BETG. Def. Statement of Facts (Dkt. No. 42) at ¶¶ 30, 32, 33.[13] RVCSD relies on New York law, presumably either because the case is in federal court in New York based on diversity or because the Agree-

ment states that it "shall be governed under the laws of the State of New York without regard to the principles of conflict of law." Agreement (Dkt. No. 1, Ex. A) at § 32.

■ The Agreement's choice of law clause should not govern the piercing the corporate veil analysis because that issue is distinct from the formation and interpretation of the Agreement itself. *See United Trade Assocs. Ltd. v. Dickens & Matson (USA) Ltd.*, 848 F.Supp. 751, 759 (E.D.Mich.1994) ("Although the choice of law clause directs this Court to interpret the contractual dispute under English law, the issue of piercing the corporate veil is collateral to the contract, and thus this Court is not bound by the choice of law provision.").

■ New York law governs, based on the diversity that brought this matter to federal court. New York choice of law rules refer the Court to the substantive corporate law of Massachusetts, the state of incorporation. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) (in case governed by New York law, applying New York choice of law principles directed court to use state of incorporation's law, Delaware law, to determine if the corporate veil should be pierced). Therefore, Massachusetts law will govern this analysis.

#### (2) *Standard for piercing the corporate veil*

■ Piercing the corporate veil in Massachusetts is not an easy task because, as the Supreme Judicial Court explains in the leading case on the issue, "Massachusetts has been somewhat more 'strict' than other jurisdictions in respecting the sepa-

---

**13.** For the reasons that follow, the liability of NSTAR, BEC Energy, Commonwealth Energy Systems, and BEC Newco, Inc. will not be considered and therefore their states of incorporation will not be considered.

rate entities of different corporations." *My Bread Baking, Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748, 752 (1968); *see also Eldridge v. Provident, Inc.,* 2001 WL 13344, *5 (Mass.Super.2001) ("Massachusetts law requires a substantial quantum of proof if the stand-alone existence of a corporation is to be disregarded."), *Birbara v. Locke,* 99 F.3d 1233, 1234, 1239 (1st Cir.1996) (reversing a jury verdict because "the evidence [was] insufficient to meet the strict standards Massachusetts has set for piercing the corporate veil" and collecting cases), *Evans v. Multicon Constr. Corp.,* 30 Mass.App.Ct. 728, 574 N.E.2d 395, 398 (Mass.App.Ct. 1991) ("In *'rare particular* situations to prevent gross inequity,' disregard of separate corporate entities may be warranted ....") (emphasis added) (citing *My Bread,* 233 N.E.2d at 752); *Scott v. NG U.S. 1, Inc.,* 2003 WL 22133177, *7 (Mass.Super.2003) (stating that piercing the corporate veil is "an extraordinary remedy"); *R & R Chems. v. Cellect,* 2002 WL 2018725, *5, 2002 U.S. Dist. LEXIS 16379, *15 (D.Mass.2002) ("Because piercing is the exception, not the rule, plaintiffs must meet a very high standard before they will be allowed to disregard a corporate form.") (quotations and citations omitted).

██ The hesitance of Massachusetts in piercing the corporate veil has a sound basis. Courts have noted that "[t]he risk that a defendant without fraud and in the normal course of business operations, may become unable to answer to a judgment is inherent in any civil litigation." *Evans,* 574 N.E.2d at 400. But the inability of a corporation to answer to its debts alone is never enough to pierce the corporate veil. The Supreme Judicial Court has explained its hesitance to pierce the corporate veil:

> [It] relates to the quite distinct issue whether the effects of liability of one

corporate entity should be visited upon a related entity. Corporate distinctness is respected as a means of limiting liability and thus fostering investment in corporate enterprises. *Birbara,* 99 F.3d at 1241 (citing to *Strom v. Am. Honda Motor Co.,* 423 Mass. 330, 667 N.E.2d 1137, 1145–46 (1996)).

██ It is well-settled that Massachusetts courts will pierce the corporate veil only when there is "compelling" evidence that one of two situations exist:

1] there is active and pervasive control of related business entities by the same controlling persons *and* there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or 2] there is "a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting."

*Evans,* 574 N.E.2d at 398 (citing to *My Bread,* 233 N.E.2d at 752).

██ To determine if either event has occurred such that the corporate veil should be pierced, *Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 14–16 (1st Cir.1985), established twelve factors to consider in making that assessment: (1) common ownership, (2) pervasive control, (3) confused intermingling of business activity and assets, (4) thin capitalization, (5) nonobservance of corporate formalities, (6) absence of corporate records, (7) no payment of dividends, (8) insolvency at the time of the litigated transaction, (9) siphoning away of corporate assets by the dominant shareholders, (10) nonfunctioning of officers and directors, (11) use of the corporation for transactions of the dominant shareholders, and (12) use of

the corporation in promoting fraud. *See also R & R Chem.*, 2002 WL 2018725, *5, 2002 U.S.Dist. LEXIS 16379, *16 (noting that "[w]hile *My Bread* sets the standard for piercing the corporate veil, *Pepsi–Cola* elucidates factors to consider when applying the *My Bread* test."). These twelve factors are not of equal importance, and "the exercise is, of course, not one in counting." *Evans*, 574 N.E.2d at 400. But, rather, the factors should be used in a balancing test so as to "form an opinion whether the over-all structure and operation misleads." *Id.*

■ In the case of a parent-subsidiary relationship, the analysis has received additional caution. Courts applying Massachusetts law have repeatedly held that simply having overlapping members of the Boards of Directors or officers "does not meet the test of 'active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control.'" *Birbara*, 99 F.3d at 1240 (citing to *My Bread*, 233 N.E.2d at 752). In *Birbara*, the First Circuit did not pierce the corporate veil because overlapping directors between the two corporations were insufficient to create confused intermingling:

> There is no evidence that there was any confusion about on whose behalf a director was acting in any given instance. Locke and Williamson, in their capacities as directors of both [the parent and subsidiary corporations] did sometimes act on behalf of both corporations simultaneously, but that is to be expected when individuals serve as directors for both a parent and its subsidiary. It is also to be expected that when a subsidiary company profits, the parent company will as well. That the fortunes of [the parent and subsidiary] were to some extent linked does not, as plaintiffs

suggest, militate in favor of piercing the corporate veil.

*Id.* at 1239–40.

■ Additionally, with respect to control, it is clear that "[u]ltimate control is, of course, inherent in the nature of [a parent-subsidiary] relationship, but the case law makes clear that such control does not render the parent liable for the conduct of the subsidiary." *Clark v. Leasecomm Corp.*, 2000 WL 1512373, *11 (Mass.Super.2000) (denying liability of parent corporation where plaintiff alleged only that the offending defendant corporation was the wholly owned subsidiary of the parent which share officers, directors, employees, professional advisors, and offices, and that the parent corporation controls the operations and management of subsidiary); *see also Scott*, 2003 WL 22133177, *7 ("in the absence of some very special facts, the veil should not be pierced and a parent corporation should not be held responsible for the subsidiary's acts that occurred decades before the parent corporation acquired the subsidiary").

After conducting the fact-intensive inquiry that *My Bread* and *Pepsi* require, several courts have denied summary judgment where material facts were in doubt. For example, in *R & R Chemicals*, 2002 WL 2018725, *1–2, 2002 U.S. Dist. LEXIS 16379, *4, Robinson, the R & R president, authorized Baskent, President of Foam–Tech, to negotiate a procurement contract with defendant Cellect. When Cellect credited a payment that R & R had made under that contract to Foam–Tech's preexisting debt, R & R brought suit alleging breach of contract. *Id.* at 2002 WL 2018725, *2–3, 2002 U.S. Dist. LEXIS 16379, *7. To determine whether that payment was properly applied to Foam–Tech's debt, the court analyzed whether the corporate veil between R & R and Foam–Tech should be disregarded such that R &

R should be liable for Foam–Tech's debts. Finding factual evidence that supported both positions, the court denied summary judgment and ordered a trial to determine whether to pierce the corporate veil.[14] *Id.* at 2002 WL 2018725, *5–6, 2002 U.S. Dist. LEXIS 16379, *17–18; *see also Eldridge,* 2001 WL 13344, *5 (denying summary judgment and noting that "[w]here a parent company... pervasively controls the activities of its subsidiaries... the parent company *may* be liable for the wrongful conduct of the subsidiary") (emphasis added).

The Moving Defendants contend that "[a]n action to pierce the corporate veil in a contract action may not even exist under Massachusetts law." Moving Defendants' Mem. (Dkt. No. 41) at 20 (citing to *Hunter v. Youthstream Media Networks, Inc.,* 241 F.Supp.2d 52, 61 (D.Mass.2002)). However, one Court has recognized that "shortly after the *My Bread* decision, the Massachusetts Supreme Judicial Court ... considered a contract case without making a distinction between tort and contract alter ego liability." *Callahan & Sons v. Dykeman Elec.,* 266 F.Supp.2d 208 n. 38 (D.Mass.2003) (citing to *Gordon Chem. Co. v. Aetna Cas. and Sur. Co.,* 358 Mass. 632, 266 N.E.2d 653, 657 (1971)). *See also R & R Chem.,* 2002 WL 2018725, 2002 U.S. Dist. LEXIS 16379, *Eldridge,* 2001 WL 13344 (both denying summary judgment

and allowing veil piercing in contract dispute to be addressed at trial).

Additionally, the present case involves only corporate defendants. This is significant because "commentators have noted that courts have evinced a greater willingness to reach the assets of corporate as opposed to personal shareholders." *Birbara,* 99 F.3d at 1237 n. 3 (internal quotations and citations omitted).

(3) *The relationships between the corporate defendants*

Coneco, the only defendant to actually sign the Agreement, was formed on February 7, 1991. Def. Statement of Facts (Dkt. No. 42) at ¶ 33. Boston Edison is a regulated public utility incorporated in Massachusetts, and by state law is not permitted to conduct unregulated business activities. *Id.* at ¶ 30. Boston Edison therefore created a wholly owned subsidiary, BETG, in 1993 to conduct unregulated activities. *Id.* at ¶¶ 31, 32. On August 19, 1994, BETG purchased a controlling interest in Coneco, and on July 31, 1996 purchased the remaining shares of Coneco stock. *Id.* at ¶¶ 34, 35.

Defendant BEC Energy was a public utility holding company that was formed in April 1998 at which time Boston Edison and BETG became its separate, wholly-owned subsidiaries. *Id.* at ¶¶ 37, 38. On August 25, 1999, BEC Energy merged

---

14. Specifically, affidavits demonstrated facts that weighed in favor of piercing the corporate veil: Baskent had the idea to form R & R and exercised pervasive day-to-day management control over it, R & R and Foam–Tech were located at the same site and shared a fax number, Foam–Tech employees designed the R & R letterhead, the corporations shared sales and marketing employees, R & R was not in existence at the time of Baskent's negotiations with Cellect, Robinson was a figurehead officer of R & R, Baskent told other employees that R & R was his company under his control, and notably that Cellect was con-

fused into believing that R & R was Baskent's company. 2002 WL 2018725, *5–6, 2002 U.S. Dist. LEXIS 16379, *17–18. However, several material facts weighed against piercing the corporate veil: neither corporation has any ownership or financial interest in the other, Baskent has never held an official position with R & R; there is no evidence of siphoning off assets from R & R to Foam–Tech or vice versa, and R & R was separately funded by Robinson. *Id.* at 2002 WL 2018725, *6, 2002 U.S. Dist. LEXIS 16379, *18.

with Commonwealth Energy System, another public utility holding company, and the merged entity was temporarily known as BEC Newco, Inc. *Id.* at ¶ 39. Now, BEC Energy and Commonwealth Energy System are wholly owned subsidiaries of NSTAR, an exempt public utility holding company. *Id.* at ¶¶ 39, 40.

All of the named corporate defendants were incorporated in the state of Massachusetts or regulated under Massachusetts law.

(4) Piercing the corporate veil of NSTAR, BEC Energy, *Commonwealth Energy Systems, and BEC Newco, Inc.*

RVCSD alleges that defendants NSTAR, BEC Energy, Commonwealth Energy Systems, and BEC Newco, Inc. (collectively referred to as "Affiliate Defendants") are "affiliated with or are successors in interest to Defendant Coneco Corporation and Defendant Boston Edison Company and are legally responsible for the antecedent debts of Defendant Coneco Corporation and Defendant Boston Edison Company." Complaint (Dkt. No. 1) at ¶ 5. Plaintiff further alleges that "[s]ome or all of the [Affiliate] Defendants are the current owners of Coneco and/or Boston Edison" who "knowingly and intentionally procured Coneco and Boston Edison's breach of their contract with [RVCSD]." *Id.* at ¶¶ 53, 94.

 As the *My Bread, Evans,* and *Pepsi–Cola* criteria suggest, the question of whether to pierce the corporate veil is "undeniably fact-intensive." *Eldridge,* 2001 WL 13344, *6; *see also U.S. Fire Ins. v. Peerless Ins. Co.,* 2004 WL 1515591, *7 (Mass.Super.2004) (stating, "[t]he question of whether to pierce the corporate veil is fact-intensive") (citing *Evans,* 574 N.E.2d at 398). Therefore, in order to pierce the corporate veil, RVCSD must demonstrate the existence of facts, based upon the *Pepsi–Cola* criteria, to establish that the distinct corporate forms should be disregarded and liability should be attributed to the Affiliate Defendants for the actions of Coneco.

 With respect to the Affiliate Defendants, RVCSD alleges that they "knowingly and intentionally procured" Coneco's breach of contract with RVCSD. But, RVCSD does not assert any facts, other than ownership, to support the piercing of the corporate veil. It is clear that ownership alone does not warrant piercing the corporate veil. *See Gordon Chem.,* 266 N.E.2d at 657 (stating that "ownership of all the stock and the absolute control of the affairs of a corporation do not make that corporation and the individual owner identical, in the absence of a fraudulent purpose in the organization of the corporation"). As RVCSD puts forth no material facts to support the piercing of the Affiliate Defendants' corporate veils, all of the claims against them must be dismissed.

(5) *Piercing the corporate veil of Boston Edison Company and BETG*

 Next the Court must determine if the corporate veils of Boston Edison and BETG (collectively "Parent Defendants") should be pierced. As explained above, when the Agreement was signed in June 1997, Coneco was wholly owned by BETG, while BETG was itself a wholly owned subsidiary of Boston Edison. At all relevant times, therefore, Coneco was a subsidiary of the Parent Defendants. In moving for summary judgment, the Parent Defendants allege that Coneco was a distinct corporation from Boston Edison and BETG that would preclude piercing the corporate veils. RVCSD contends that the veil that shields these Parent Defendants from the liability of its subsidiary should be pierced because the Parent Defendants

and Coneco assured RVCSD that a contract with Coneco was a contract with Boston Edison, thus misleading the School District as to their true corporate identities. The Court will consider the twelve factors that govern the piercing the corporate veil analysis in Massachusetts, but will only discuss the factors for which there is evidence before the Court.

### (i) Common ownership

There is no dispute that there is common ownership of Coneco, Boston Edison, and BETG. It is clear that as of July 31, 1996, BETG owned all the stock of Coneco, Def. Statement of Facts (Dkt. No. 42) at ¶ 35, and BETG is a wholly owned subsidiary of Boston Edison, *id.* at ¶ 31, 32. However, when weighing this factor, it is clear that a parent subsidiary relationship alone does not support piercing the corporate veil; it is the facts of that relationship that must be carefully considered. *See Clark,* 2000 WL 1512373, *11.

Officers were also shared. For example, Rick Zimbone served as both CEO of Coneco and President of BETG. Def. Statement of Facts (Dkt. No. 42) at ¶ 49. That officers were also shared between Boston Edison and BETG was evidenced by Zimbone's statement that "throughout the time [he was] at BETG [he was] an employee on loan from Boston Edison." Zimbone Tr. (Dkt. No. 56, Ex. 13) at 15. Of course, in the absence of a fraudulent purpose, overlap of ownership and officers between a parent and a subsidiary does not establish the requisite control to pierce the corporate veil. *See Gordon Chem. Co.,* 266 N.E.2d at 657.

### (ii) Pervasive control

RVCSD points to three documents which it contends exhibits some degree of control by the Parent Defendants over Coneco. RVCSD Reply Statement of Facts (Dkt. No. 56) at ¶ 41. Boston Edison and BETG deny that there are any documents which demonstrate such control. Def. Statement of Facts (Dkt. No. 42) at ¶ 41.

First, in a January 2, 1999 memorandum, Philippe Frangules wrote to Donald Gilligan to inform him of the RVCSD project's history. (Dkt. No. 56, Ex. 15). Although Frangules was then with Boston Edison and Gilligan with Coneco, the document is not evidence that Boston Edison controlled Coneco's actions. It appears that Frangules is only disseminating information that he knew from his tenure as a BETG employee, not directing officers what future actions should be taken. *See id.*

The second document contains presentations from a Coneco Board meeting held on December 11, 1995. (Dkt. No. 56, Ex. 17). RVCSD's citation to the entire document, 72 pages in length, is unavailing because generally, the document does not demonstrate that either Boston Edison or BETG exerted control over the daily operations of Coneco. However, after the Court's review, some evidence of control is found in the 1996 Operations Plan which contains statements demonstrating that BETG's policies and procedures may have bound Coneco. For example, "regular reports are now being produced [by Coneco] on the monthly and quarterly schedules *required* by BETG." 1996 Operations Plan (Dkt. No. 56, Ex. 17) at B 001915 (emphasis added). As RVCSD makes no specific page references, the Court will not delve further into that exhibit searching for additional evidence of such control.

The final document that RVCSD cites provides evidence of sharing of severance packages. That document may demonstrate an element of control and thus be relevant here, but is more applicable to the discussion of corporate formalities below.

Also discussed by the Parent Defendants are the Tax Sharing Agreement ("TSA") and the Management Services Agreement ("MSA"). Def. Statement of Facts (Dkt. No. 42) at ¶¶ 56–60. RVCSD discussed neither of these documents in detail. The MSA does not evidence control. The MSA allows Boston Edison to charge its unregulated subsidiaries, such as BETG or Coneco, for any services Boston Edison employees provide them to avoid subsidization of unregulated activities by customers of the public utility. *Id.* at ¶¶ 57–59. However, that document does not establish control because it does not mandate that Coneco accept Boston Edison services, but rather it establishes what transpires if such services are accepted. In fact, by requiring payment for any services provided to Coneco by Boston Edison, the document reaffirms the distinct corporate identities.

The TSA provides that Boston Edison's subsidiaries are to calculate their own tax annually and pay their tax liability to Boston Edison. Def. Statement of Facts (Dkt. No. 42) at ¶ 60. In the event of a loss, Boston Edison would pay to the subsidiary the value of such loss. *Id.* Any payments made under the TSA could be made in cash or accounted for in the books of account between Boston Edison and the subsidiaries. *Id.* The TSA therefore just dictates how the corporations will pay their tax liability. RVCSD does not elaborate on how this demonstrates control by the Parent Defendants over Coneco.

The Parent Defendants contend that "the record shows that Boston Edison had nothing to do with the development or approval of Coneco's business plan." Def. Mem. (Dkt. No. 51) at 14. However, the Court has reviewed a letter written by Stephen Black, Vice President of Coneco, on January 12, 1999, to David Giles, RVCSD Superintendent. Therein, Black states that "the parent company of [Coneco], Boston Edison Company, has made a strategic decision ... to focus on expanding its regulated operations within the local service territory .... Accordingly, Coneco hereby respectfully withdraws from the opportunity to perform construction management services at [RVCSD]." Letter of Stephen Black (Dkt. No. 58, Ex. D to the Affirmation of Leah Murphy). Such statements indicate that Boston Edison made corporate decisions which impacted Coneco's business plan. This evidences significant control by Boston Edison over Coneco.

### (iii) Confused intermingling of business activity or assets

It appears as though the affairs of BETG and Coneco were at some times intertwined. For example, the Court has reviewed several letters that were written by Richard Zimbone who was both CEO of Coneco and Senior Vice President of BETG.[15] (Dkt. No. 56, Ex. 21). Those letters discussed the affairs of Coneco. For example, in two of those letters, Zimbone's purpose was "to introduce the Coneco Corporation" and offer its services to the recipient. Letters of April 7, 1995 of Richard Zimbone (Dkt. No. 56; Ex. 21). Although all of these letters discussed only Coneco's business, they were written on Zimbone's BETG stationary. Additionally, Zimbone intertwined his roles when he wrote that he "accepted the BETG assignment two years ago, because [he] believe[d] that the types of services offered by Coneco are the future of the utility

---

15. These documents link Boston Edison, as well. At the time he wrote those letters, Zimbone was a Boston Edison employee, who was on loan to BETG. Zimbone Tr. (Dkt. No. 56; Ex. 13) at 15; April 7, 1995 Letter (Dkt. No. 56; Ex. 21) (Zimbone referring to his background as that of "a career Boston Edison Employee").

industry ...." Letter of April 7, 1995 (Dkt. No. 56, Ex. 21) at R 000048. These letters demonstrate more than an officer who serves both a parent and a subsidiary. They provide evidence of the co-mingled business activity of BETG and Coneco, weighing in favor of piercing the corporate veils.

### (iv) Thin capitalization

When Boston Edison created BETG as an unregulated subsidiary, not more than $45 million was to be set aside to fund its activities. Def. Statement of Facts (Dkt. No. 42) at ¶ 31. Presumably, a portion of that $45 million was used to purchase and support Coneco. When BETG first acquired its controlling interest in Coneco on August 19, 1994, and then purchased the remaining shares of Coneco stock on July 31, 1996, these transactions were conducted at arm's length. *Id.* at ¶¶ 34–35. There is no claim by RVCSD that these transactions left Coneco undercapitalized.

### (v) Nonobservance of corporate formalities

The Parent Defendants assert that they observed corporate formalities, keeping individual financial and corporate records, separate material operations, consulted separate attorneys and negotiated agreements separately. Def. Statement of Facts (Dkt. No. 42) at ¶¶ 61–70. In fact, pursuant to Massachusetts law and the regulation of the Massachusetts Department of Telecommunications and Energy, BETG and its subsidiaries' activities, which are all unregulated, must be kept separate from that of Boston Edison, a regulated public utility. *Id.* at ¶¶ 30–32. This clear boundary is erected so that utility customers do not have to contribute financially to the unregulated corporate activities. This requirement lends significant support to the position that Boston Edison remained distinct from BETG and Coneco at all times.

To demonstrate that the corporations did not observe corporate formalities, RVCSD points to additional evidence, but that evidence provides no justification for piercing the corporate veils. There was common office space, as Zimbone maintained offices at both the Coneco and Boston Edison complexes. RVCSD Mem. (Dkt. No. 56) at 8; Zimbone Tr. (Dkt. No. 56, Ex. 13) at 19. RVCSD also alleges, without submitting factual evidence, that Boston Edison engineers reviewed the RVCSD project proposal and an independent contractor was paid by BETG to review the RVCSD Agreement. RVCSD Mem. (Dkt. No. 56) at 8.

RVCSD cites to a document which appears to demonstrate that Coneco shared employee severance packages with Boston Edison. The written offer made to Donald Gilligan when he was hired as Coneco's Vice President informs him that his severance package will be given "in accordance with the then current policy of Boston Edison Company in effect from time to time." Letter to Donald Gilligan (Dkt. No. 56, Ex. 18) at B 000064. However, Gilligan has explained that although other employee benefit packages were "consolidated for the purposes of group economy," the plans themselves are not the same nor shared between the corporations. Gilligan Tr. (Dkt. No. 56, Ex. 8) at 94–95.

Defendants state that they maintained separate financial statements, Def. Mem. (Dkt. No. 41) at 16–17, but factual questions arise with respect to that position because Boston Edison and Coneco publicly represent that they have consolidated financial statements. October 22, 1996 Letter of Richard Zimbone (Dkt. No. 56; Ex. 21) at B 002048. Additionally, under the TSA, the corporations paid their tax liabilities together. Def. Statement of Facts (Dkt. No. 42) at ¶ 60. However, this was only after they calculated them inde-

pendently. These financial arrangements do not necessarily support piercing the corporate veils. In *Birbara*, 99 F.3d at 1235, the court explained that it was good accounting practice for the parent and subsidiary to have consolidated financial statements and would not pierce the corporate veil on this basis as long as each kept its own financial records.

### (vi) Insolvency at the time of the litigated transaction

Defendants assert that Coneco's future financial difficulty could have been readily ascertained when the Agreement was signed, as RVCSD was free to seek additional information pertaining to the financial strength of the corporation, but chose not to do so. In fact, had RVCSD reviewed Coneco's 1995 and 1996 consolidated financial statements, the School District would have been aware that:

> The Company [Coneco] relies on ongoing financial support from BETG which BETG has committed to provide through May 31, 1998. Discontinuation of such support could have a material adverse effect on the ability of the Company to continue as a going concern. Coneco Consolidated Financial Statements (Dkt. No. 46: Attached as an exhibit).

The Defendants contend, therefore, that because RVCSD did not avail itself of the opportunity to review such statements, it has no legal basis upon which to fault the Parent Defendants for RVCSD's being unaware of Coneco's financial status. Def. Mem. (Dkt. No. 41) at 21–22. Before entering into a contract such as the Agreement at issue in this litigation, RVCSD would have been well-advised to review all of Coneco's financial statements. Coneco was in financial difficulty when it entered into the Agreement, and this would have been apparent had RVCSD examined Coneco's financial statements. Therefore,

this factor would weigh in favor of the Parent Defendants because RVCSD had the ability to learn of the financial status of Coneco but did not pursue such information. However, the weight that is afforded to the Parent Defendants for this factor is significantly diminished by their actions which may have fraudulently misled RVCSD, as will be discussed in the following section.

### (vii) Use of the corporation in promoting fraud

RVCSD claims that the corporations acted fraudulently by repeatedly suggesting that "a contract with Coneco is a contract with Boston Edison." RVCSD Mem. (Dkt. No. 56) at 4. RVCSD states that the "representations made by Coneco and Boston Edison as to the financial relationship of Coneco and Boston Edison were material in [RVCSD's] decision" to award Coneco the contract. Complaint (Dkt. No. 1) at ¶ 35. If fraudulent assertions were made which misled RVCSD as to which corporate entities were involved in the project's financial support, then piercing the corporate veil may be warranted. In support of its position that Coneco was a "mere instrumentality" of the Parent Defendants, RVCSD Mem. (Dkt. No. 56) at 6, RVCSD relies on statements allegedly made at the RVCSD Board meeting and written statements by BETG and Coneco representatives.

First, RVCSD contends that "representatives of Coneco and Boston Edison" attended RVCSD Board meetings, giving assurances that the School District could trust Coneco because it was affiliated with and fully backed by Boston Edison, a multi-billion dollar company. *See* Complaint (Dkt. No. 1) at ¶¶ 19–21, 24. Defendants assert that RVCSD cannot identify any Boston Edison employees who attended any Board meeting or made false repre-

sentations. Def. Statement of Facts (Dkt. No. 42) at ¶¶ 44–48, 50–51.

In response to written interrogatories, RVCSD names specific individuals who made these representations. RVCSD contends that Stephen Black, Kevin Monagle, Richard Zimbone, Michael Bossin, Donald Gilligan and John Judge attended the RVCSD Board meetings and made the alleged assurances.[16] *See* Interrogatory Responses 1–3 (Dkt. No. 45, Ex. M). In contrast to the interrogatory responses, no Boston Edison employee is named in the attendance lists that appear in the RVCSD Board meeting minutes prior to the execution of the Agreement. The minutes show that Donald Gilligan attended a meeting on August 14, 1996 and gave an "Energy Project Presentation." RVCSD Board Meeting minutes of August 14, 1996 (Dkt. No. 56, Ex. 4) at 002719. Those meeting minutes also indicate that "several others" were present. *Id.* RVCSD also contends that Mr. Gilligan distributed a copy of the Boston Edison financial statements. RVCSD Mem. (Dkt. No. 56) at 8–9. Steven Black and John Judge, both Coneco officials, joined Mr. Gilligan at a November 13, 1996 meeting of the Board. RVCSD Board meeting minutes of November 13, 1996 (Dkt. No. 56, Ex. 4) at 002667. The minutes from that meeting indicate that "Coneco gave a project update and answered questions." *Id.* at 002668.

In support of their position that no Boston Edison or BETG officials ever attended the School District's Board meetings, the Parent Defendants point to the testimony of Jerome Plaza, RVCSD's 30(b)(6) witness. Mr. Plaza was not certain who those unnamed individuals at the August 14 meeting were, Plaza Tr. (Dkt. No. 56, Ex. 6) at 69, and could not specifically recall Mr. Zimbone ever appearing at a School District Board meeting, *id.* at 71. He also did not recall whether other Coneco or Boston Edison officials were present at the November 13, 1996 meeting. *Id.* at 80–81.

These brief statements in the minutes cannot demonstrate that Coneco or the Parent Defendants made the alleged representations to RVCSD, especially considering the testimony of RVCSD's 30(b)(6) witness, but it certainly signifies unresolved factual questions as to who appeared at those meetings and what was said.

Second, there is additional evidence to support RVCSD's claim that the Parent Defendants misled it into believing that a contract with Coneco was a contract with them. Coneco sent a letter to RVCSD's Superintendent on August 7, 1996 that makes statements that may have misled RVCSD into believing that there are no

---

16. Specifically, the interrogatory responses state that Stephen Black, Kevin Monagle, and Richard Zimbone attended an RVCSD Board meeting and "affirmed that Boston Edison would guarantee the commitments made by Coneco." First Interrogatory Response (Dkt. No. 45, Ex. M). These three individuals, in addition to Michael Bossin, Donald Gilligan, and John Judge, allegedly "made representations that the Coneco Corporation was 'fully backed by the financial resources of the Boston Edison Company.'" Second Interrogatory Response (Dkt. No. 45, Ex. M). Finally, RVCSD states that Richard Zimbone, Donald Gilligan, and Michael Bossin "knowingly and

intentionally made false representations to [RVCSD] that Boston Edison would provide Coneco with funding with which to operate and complete its obligations to third party beneficiaries." Third Interrogatory Response (Dkt. No. 45, Ex. M).

Mr. Bossin was a co-founder of Coneco. Gilligan Tr. (Dkt. No. 56, Ex. G) at 6–7. Mr. Black was a Coneco employee, prior to it being purchased by BETG. Black Tr. (Dkt. No. 45, Ex. I) at 9–10. Mr. Monagle was CFO of BETG. *Id.* at 7–8. John Judge was a Coneco employee beginning in November 1996. Judge Tr. (Dkt. No. 45, Ex. E) at 4–5.

corporate boundaries between Boston Edison and Coneco:

> [Coneco] is a wholly owned subsidiary of the Boston Edison Company, a 3.6 billion dollar asset electric utility company. Coneco's operations are *fully backed* by the assets of Boston Edison .... I have enclosed 12 copies of our marketing literature, including the Boston Edison Annual Report.
>
> Letter of John Judge (Dkt. No. 45, Ex. Q) at 002594 (emphasis added).

These statements are similar to those allegedly made at the Board meetings, thereby bolstering RVCSD's assertion that such statements were, in fact, made.

Even if that assertion, namely, that Coneco was fully backed by Boston Edison's financial assets, came to RVCSD only from Coneco representatives such as Stephen Black, John Judge, and Donald Gilligan, piercing the corporate veil may be warranted because there is evidence that Coneco officials may have made such statements at the request of BETG. As discussed above, Richard Zimbone wrote letters on BETG stationary to encourage the recipients to contract with Coneco. One letter makes the very statement that RVCSD claims was fraudulently made to the School District, namely, that "Coneco enjoys the full financial and operational support of Boston Edison Company ...." *Id.*[17] With this information, Zimbone includes Boston Edison's financial statements as he is "introduc[ing] Coneco services." *See, e.g.*, April 7, 1995 Letter (Dkt. No. 56, Ex. 21) at R 000049. Zimbone's making the same misleading statement on BETG stationary provides evidence that Coneco may have received a directive from BETG to do the same. Not only does this indicate that the fraudulent assertions may have been coordinated between the corporations, but it would also be additional evidence of BETG's control over Coneco.

Of course, RVCSD, as with any contract, had the option of asking Boston Edison or BETG to sign or guaranty the Agreement, but they did not. Needless to say, such actions would have been prudent. However, RVCSD contends that it was misled to believe that the definition of "Coneco" that appears in the Agreement included Boston Edison and BETG, thus demonstrating why RVCSD did not insist upon having the Parent Defendants sign the Agreement.[18] RVCSD Reply Statement of Facts (Dkt. No. 56) at ¶ 26. Kevin George, Coneco's Vice President and signatory to the Agreement, testified that he vaguely recalled that this definition was included to allay customer concerns that Boston Edison was going to be backing Coneco and that that language may have thereafter been reviewed by Boston Edison's lawyers. George Tr. (Dkt. No. 45, Ex. J) at 31–37.

The Parent Defendants contend that RVCSD should have inquired as to the financial status of Coneco. Def. Mem. (Dkt. No. 41) at 21–22. However, the Parent Defendants have also stated that "[a]s a subsidiary, Coneco Corporation's financial results are consolidated into Boston Edison in accordance with Generally Accepted Accounting Principles. Coneco's results are not separately disclosed." October 22, 1996 Letter of Richard A. Zimbone (Dkt. No. 56, Ex. 21). Such state-

---

17. Although, Zimbone's letter perhaps emphasizes the *limited* funding. Zimbone states that "Boston Edison has set aside equity capital of $45 million to support such activities." April 7, 1995 Letter (Dkt. No. 56, Ex. 21) at R 000049.

18. "Coneco" is defined in the Agreement as "[r]elated entities or persons, and their affiliates and sub-contractors, and their directors, officers, employees, and agents of any of them." Agreement (Dkt. No. 1, Ex. A) at § 1.1.

ments would indicate that RVCSD had no reason, then, to seek further detailed information on the financial status of Coneco, after having obtained the financial information of Boston Edison. Suggesting that RVCSD should have obtained Coneco's individual financial statements is disingenuous at best, and potentially fraudulent, in light of the alternative position the Parent Defendants have taken.[19]

Massachusetts courts have willingly denied summary judgment where questions of fact remain involving the *Pepsi* factors and the piercing the corporate veil analysis. Although the Court will not hold as a matter of law that the evidence presented is a sufficient basis upon which to pierce the corporate veils of Boston Edison and BETG, it is apparent that the evidence creates sufficient factual issues for a jury.

### (d) Moving Defendants liability based upon other theories

In its complaint, RVCSD presents alternative theories for the Moving Defendants' liability for the damages Coneco caused. RVCSD claims that the Moving Defendants were unjustly enriched by the actions of Coneco, that the Moving Defendants were bound to the Agreement based upon principles of agency, and the School District was a third party beneficiary to other contracts between Coneco and the Moving Defendants. The Court will not address these positions because it has already determined that questions of material fact remain with respect to one theory of liability, piercing the corporate veil, which is a sufficient basis upon which to deny summary judgment.

## III. CONCLUSION

Accordingly, it is hereby

ORDERED, that RVCSD's motion for summary judgment is **GRANTED** with respect to its claim that Coneco breached its obligation to provide energy management services; and it is further

ORDERED, that the remainder of RVCSD's motion for summary judgment is **DENIED**; and it is further

ORDERED that the Defendants' motion for summary judgment is **GRANTED** with respect to the Affiliate Defendants, NSTAR, BEC ENERGY, Commonwealth Energy System, and BEC Newco, Inc, and these Affiliate Defendants are **DISMISSED** from this action; and it is further

ORDERED, that the remainder of Defendants' motion for summary judgment which asked for the dismissal of the Parent Defendants, Boston Edison and BETG, is **DENIED**; and it is further

ORDERED, that the Clerk serve a copy of this order on all of the parties to this action.

IT IS SO ORDERED.

---

19. Defendants discuss in detail why they think that the Boston Edison financial statements sent to RVCSD were merely informal marketing materials and not a formal response to the Request for Proposals. However, the Court will not draw a distinction between the two possibilities. The critical question is whether the Defendants misled RVCSD into believing the facts were not as they were represented, and such a belief could arise whether the statements were made as part of the formal contracting process or otherwise.